William H. FULLER, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19532.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 18, 1966 and Jan. 17, 1968.

Decided Nov. 20, 1967.

On Rehearing En Banc
Sept. 26, 1968.

Certiorari Denied March 3, 1969.
See 89 S.Ct. 999.

See also, D.C., 243 F.Supp. 178.

Messrs. Ezekiel G. Stoddard, and A. Alvis Layne, Washington, D. C. (both appointed by this Court), with whom Messrs. Walter T. Evans, and James Robertson, Washington, D. C., were on the brief, for appellant.

Mr. Richard L. Braun, Attorney, Department of Justice, with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and David Epstein, Asst. U. S. Attys., were on the brief, for appellee. Charles A. Mays and James A. Strazzella, Asst. U. S. Attys., also entered appearance for appellee.

Before FAHY,* BURGER and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

On a three-count indictment charging first degree felony-murder, first degree premeditated murder, and rape, appellant was found guilty as charged on counts one and three and convicted of manslaughter as a lesser included offense of the second count. A motion for a judgment of acquittal notwithstanding the verdict on the rape count was denied. United States v. Fuller, 243 F.Supp. 203 (D.D.C.1965). Concurrent with a life sentence for the felony-murder, he has been sentenced to 5-to-15 and 10-to-30 years respectively for manslaughter and rape. On this appeal he challenges the admission into evidence of two incriminatory oral statements and the search

* Circuit Judge Fahy became Senior Circuit Judge on April 13, 1967.

for and seizure of some of his wearing apparel, introduced at trial.

## I

Some time Sunday morning, August 16, 1964, an assailant accosted a 57-year old Negro woman as she walked along a Washington street, dragged her into an alley behind some stores, and while assaulting her sexually, caused her death by a blow on the head. The body was found the next day lying in a stairwell at the rear of a house. The two police officers investigating the crime, both detectives, found several items strewn about the scene of the crime and obtained other items picked up in the vicinity by others prior to the discovery of the body. One of these items was a small, red address book which a storekeeper found in a water drain behind his shop shortly after he opened for business Monday. On the first page of this book appeared the name and address of William H. Fuller, the appellant. After interviewing persons in the neighborhood in a vain search for eye-witnesses, the two officers drove to the address indicated in the book, asked for appellant, and learned he was at work at the Washington Suburban Sanitary Commission in nearby Maryland. They were taken to his place of employment by a Montgomery County officer, in an unmarked police car. They had the supervisor locate appellant, and identified themselves to appellant. By this time it was about 4:00 p. m. on August 17, the day after the homicide.

At this point, the facts are contested. But two separate hearings were held before two different District Judges who had and evidently utilized the opportunity to observe demeanor and evaluate relative credibility. The testimony at both hearings was substantially identical, and both judges reached similar conclusions. The facts, as found by those judges,[1] are these:

The officers told appellant that they wanted to speak with him about an incident in Washington, that he did not have to talk to them, but that if he chose to talk to them the interview could be held either on the spot or at a local police station. It was quitting time and the premises were crowded and noisy, with garbage trucks returning to their garages and men leaving for the day. Appellant said he had no objection to accompanying the three officers to the Montgomery County police station. This was about 4:05 p. m. Appellant testified that he considered himself under arrest, though he conceded he was not then told he was under arrest.

On arrival at the Silver Spring police station at about 4:15, the Metropolitan police officers and appellant were given a small, unused office in the back of the station for their talk. He was told about the subject of the investigation and discussed his activities over the weekend. When he was asked about the crime, he said he didn't know anything about it. The officers showed him the address book, and appellant admitted it was his. Asked if he could explain how it got to the scene of the crime, he said he had lost it. Shortly thereafter appellant asked what would happen if he told them about it. He was told that if it concerned the crime, he would be placed under arrest and whatever he said might be used against him. He asked if his mother would have to know and was told she would find out if he admitted committing the crime. Appellant then said that he "grabbed the woman." This statement came shortly after the interview began, about 10 minutes according to the officers, about 15 minutes according to appellant. The officers then announced appellant was under arrest, advised him that he did not have to make a statement and that any statement could be admitted in evidence against him. Appellant then related the rape and homicide in detail, in a narrative lasting fifteen or twenty minutes.

It is uncontroverted that there was no violence or even abuse directed toward appellant before this confession. The

---

1. The opinion disposing of the hearing held during a recess in the trial is reported as United States v. Fuller, 243 F. Supp. 178 (D.D.C.1965).

most that is even adverted to in appellant's testimony is a statement that he was tapped a couple of times, patted on the shoulder, in a non-violent way.[2] Both District Judges described the conduct of the policemen involved as "exemplary." Prior to the statement appellant was told if he wished he could go down to get a drink from the soft-drink machine the group had seen in the station house. Appellant's only claim to medication was that he mentioned he had a headache, and was given two aspirin tablets.[3] Appellant was not told of a right to a lawyer, and he did not ask for one. There is a suggestion that appellant sought to phone his mother, but according to testimony credited by the hearing judges, appellant rather seemed concerned about whether his mother had to know what he had done.

After the oral confession, appellant was asked to make a written statement. This he declined to do, although he signed a statement indicating that he refused to make a written confession, but conceding that everything he said orally was true. (This writing was not introduced in evidence, since appellant's motion to suppress his confessions, although denied as to the oral confessions, was granted as to this written statement on the ground appellant should have been arraigned promptly after his first oral confession.) At that point the questioning was discontinued and at the request of the District officers the Maryland police arrested appellant as a fugitive from justice, pending extradition proceedings.

Later that evening the Metropolitan police secured a search warrant from a judge of the District of Columbia Court of General Sessions authorizing the seizure of the clothes appellant told the officers he wore during the commission of the crime. The application was for the search for and seizure of "dark brown trousers, red shirt, pair of men's shorts, and reddish brown patent leather shoes," set forth in the application and warrant as "instrumentalities of a crime, i. e., 1st degree murder." The warrant specifically authorized a search of the first floor of appellant's home. As a result of this search the police secured objects for scientific analysis which culminated in expert testimony at trial revealing the presence of blood on appellant's trousers, some of which was of the victim's type, and detecting fibers recovered from the surface of the victim's clothing that matched in color and texture threads from appellant's trousers and red shirt.

The following day, August 18, the Metropolitan police obtained an arrest warrant for appellant, and at about 1:30 that afternoon he was taken before a Montgomery County, Maryland, magistrate for extradition. There he was advised of the charges pending against him in the District of Columbia and of his right to an extradition hearing. The judge informed him of his right to remain silent, but apparently the only reference to counsel meant that counsel could be obtained for purposes of an extradition proceeding. Appellant *pro se* waived extradition.

As appellant was being escorted from the Rockville Courthouse in the custody of a Metropolitan police detective, appellant's mother appeared, identified herself to the detective, and asked whether she might talk with her son. The detective explained that she might but that he would have to be present, and advised appellant that anything he might say to his mother might be used against him. Appellant said he wanted to talk to his mother. A room was designated in the courthouse for appellant to talk to his mother and there appellant admitted to his mother that he had killed a woman with his hands.

Again, these are the facts as testified to by the police and found by the District

---

**2.** Appellant testified the officer did this while repeating "Come on", that appellant "better tell them all about it because they knew any way."

**3.** The officer said the only request for aspirin came from himself, since he had skipped lunch working on the case.

**1206**

Judges. Appellant denied that he had been advised of his right to remain silent and testified that he asked the officer whether he would have to tell his mother what happened, whereupon the officer said he might as well because she would find out eventually anyway.

Appellant was then returned to the District of Columbia, and at about 4:35 that afternoon received a preliminary hearing before a judge of the Court of General Sessions who fully advised him concerning his privilege against self-incrimination and his right to have counsel appointed to represent him.

As a result of the determinations at the pre-trial suppression hearing and the trial hearing, the first oral confession, the admission to his mother, and the articles of clothing seized under warrant, were admitted in evidence at the trial. Appellant claims each of these rulings was reversible error.

## II APPELLANT'S CONFESSION TO THE DETECTIVES.

We consider first the admissibility of appellant's oral confession at the Montgomery County police station. Three inter-related strands of law must be taken into account in considering the admissibility of this confession. Stated summarily at this introductory juncture, the doctrines hold that a defendant's confession is inadmissible—

(1) If it was elicited by the police at a time when the accused should have already been brought, pursuant to Rule 5(a), FED.R.CRIM.P., before a magistrate who would have advised him of his right to remain silent and made arrangements for consultation with counsel; or

(2) If it was elicited by the police when accused was without counsel, at a time and under circumstances which required either the assistance of counsel or its intentional waiver; or

(3) If the prosecution fails to establish that the confession was voluntary, and was not the product of either physical or psychological coercion that displaces the free will of the accused.

The presentation and effectuation of the constitutional privilege against self-incrimination is a common concern of all of these doctrines, although their contours are neither defined by nor limited to the protection of that privilege.

### A. Mallory Doctrine

The primary contention of defense trial counsel, raised both at the pre-trial hearing on the motion to suppress and at trial, is that the confession was inadmissible under the rule of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and its progeny, which establish that an admission cannot be used in evidence if taken at a time when the police were in violation of Rule 5(a), FED.R.CRIM.P., which requires that an officer making an arrest shall take the arrested person "without unnecessary delay" before an official empowered to commit persons charged with crime. We assume *arguendo* that the principles of Rule 5(a) are applicable even though the arrest was outside the District.[4]

Rule 5(a), and the line of *Mallory*-type cases, are directed at forbidding post-arrest confinement and interrogation without the prompt determination by an objective magistrate that there is probable cause to detain the suspect. However, we see no basis for disturbing the finding of the judge who heard the pretrial motion that appellant was not under arrest when he began to make his statement. We preface consideration of the question whether appellant was under arrest at the time of his statement by some general observations. If appellant's presence and participation in the questioning was voluntary, and at a time when no arrest had

4. Rule 40(a) insists on prompt presentation before a federal committing magistrate when a person is arrested in a nearby district. Rule 40(a) by its terms only applies when officers from one district base their authority to make an arrest in a different district on a warrant issued in their own district.

occurred, the *Mallory* rule is inapplicable.[5] Detention of a witness for the purpose of asking questions is not necessarily an arrest, at least if the detention is brief enough.[6] Even a mere stopping, however, may constitute an arrest if the officer's purpose is to assert custody over the individual in connection with a crime, a purpose he may be more likely to set forth in order to justify a simultaneous search.[7] Where an officer intends to establish custody over the person involved, a minimal control may trigger his obligation to comply with Rule 5(a). Even where the officer denies that he intended to make an arrest his actions may sufficiently manifest an arrest to require compliance with Rule 5 (a).[8] Where the officer goes to the point of asking the person to accompany him to a police station or similar place, that fact alone may be sufficient to invoke the protection of Rule 5(a) unless it is reasonably clear that it is a request and not a compulsory obligation that is involved.[9]

In the case before us the following facts were testified to by the police officers and their testimony was accepted by both district judges:

When the detectives drove up to appellant's place of employment the only item linking appellant to the crime was an address book bearing his name and found near the scene of the crime. Although the address book made appellant a suspect it did not establish probable cause to arrest him—a view shared by the District Court and this court. The officers did not intend to arrest appellant unless and until further information established probable cause. It was possible that he might himself be able to explain his loss of the book or prove to be a source of information as to others. When they identified themselves —they were in plain clothes—they gave appellant the option of whether to talk to them at all about their investigation. Appellant said he was willing to talk to them, and they asked whether he wanted to talk at his place of employment or at the station house in Silver Spring. Appellant said he would rather not talk at his place of employment. This item of testimony, which must obviously be subjected to close scrutiny, is given credence by the fact that many of appellant's co-employees were in attendance at that hour, which was quitting time, and that it was noisy in the garage where the trash trucks were returning. The detectives testified they saw no quiet place nearby for conversation.

At the Maryland police station they were shown upstairs to an unused room, containing a table and some leather chairs, where they sat down and began their conference. Prior to his making the statement that he grabbed the woman, appellant was told he was free to get a soft drink at the vending machines they passed on the way to this room.

Appellant testified that he believed he was under arrest from the time he got into the car with the officers. Appellant's testimony admittedly fell short of an outright declaration of arrest,[10] but

5. Scarbeck v. United States, 115 U.S.App. D.C. 135, 152, 317 F.2d 546, 563, cert. denied, 374 U.S. 856, 83 S.Ct. 1897, 10 L. Ed.2d 1077 (1963), and cases cited.

6. *See* Rios v. United States, 364 U.S. 253, 262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Brown v. United States, 125 U.S.App.D.C. 43, 46, 365 F.2d 976, 979 (1966).

7. *See* Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

8. Seals v. United States, 117 U.S.App.D.C. 79, 325 F.2d 1006 (1963), cert. denied, 376 U.S. 964, 84 S.Ct. 1123, 11 L.Ed.2d

982 (1964). The F.B.I. agents did not question Seals, an 18-year old, when they were with him at his home, but questioned him only after they brought him to the F.B.I. office.

9. *Compare* ALI MODEL CODE OF PRE-ARRAIGNMENT PROCEDURE § 3.05, & Comment at 120–121 (Tent. Draft No. 1, 1966).

10. Appellant testified that the detectives "said they want to talk to me, wanted to take me to the station, talk to me; and I asked them, did I have to go; and they said yes, it would be the best that I go."

we may assume for present purposes that his testimony if believed would support his *Mallory* claim.[11] However the motions judge, denying the motion to suppress, made it clear that he did not believe the appellant's version of the events and did believe the account of the officers.[12] He concluded that the detectives did not have probable cause to arrest appellant, that the officers fully understood that, and that appellant had no reason to think he was under arrest at that time.

It is conceded that appellant was never told he was under arrest until after, and this is important, a relatively brief questioning of approximately 15 minutes. The detectives testified that their purpose was to find out how appellant's notebook got to the scene of the crime (whether he had given it to anyone else, etc.). Appellant was asked to account for his actions over the weekend. He inquired why he was being asked about this, and was told the police were investigating the rape-homicide committed over the weekend. At first appellant denied any knowledge of the matter. During the interview he was asked to identify the red address book. He was further asked if he could account for its presence at the scene of the crime, wheth-

er he had any enemies, etc. He said he had lost it. But shortly after he was shown the address book, appellant asked what would happen if he told what he knew, how much time he could get, would he have to be locked up over night. He was told if he had anything to do with the matter, he would be arrested and it would be up to the courts to decide what to do with him.

"Shortly thereafter he said that he would tell us, that he had grabbed a woman on the street." Rule 5(a) did not require that the detectives break off the interview and try to arraign appellant rather than allow him to make an immediate elaboration of the mere assertion of guilt.[13] The detectives told him he was under arrest. They warned him again that anything he said could be used against him, and at that time he proceeded to relate in detail, step by step, what had happened. He related in effect that he was in a state of excitement when he left his unrequiting girl friend that fateful night, that he saw and seized the victim, hit her when she screamed, and had sexual relations.

 *Mallory's* command that an accused be taken before a magistrate "as quickly as possible" has not been inter-

11. Appellant's testimony of his understanding would not be decisive but would be material. *Compare* United States v. McKethan, 247 F.Supp. 324, 328–329 (D. D.C.1965), aff'd by order (D.C.Cir.No. 20059, 1966), where Judge Youngdahl states "the test must be not what the defendant himself * * * thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes, * * * a reasonable man, interpreting these words [of the detective] and the acts accompanying them * * *." *McKethan* has recently been cited with approval in Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158 (July 7, 1967).

We are not called on in this case to consider whether and how this general test may be subject to modification where the officer was or should have been aware of a condition of the suspect— perhaps dazed or in a state of shock— so that the officer may be required to take some additional steps, beyond those

normally involved in dealing with a presumptively "reasonable" man, to make clear that no forcible detention is intended.

12. *See, e.g.,* Tr. 73, May 24, 1965, hearing. The trial judge also credited the account of the officers above that of appellant. It is not necessary to consider his further position that it was not material whether the officers gave appellant the option of being interviewed at his place of employment, as they stated, or whether as he testified they told him they wanted to talk to him at the police station.

13. *See* Walton v. United States, 334 F.2d 343, 347 (10th Cir. 1964). There, too, defendant's admission of guilt during routine questioning at the police station caused his arrest. After interrupting the interview to warn him of his rights, the police continued to take his statement. *Mallory* was held no bar to its admission.

preted to render inadmissible every statement made by an accused to the police subsequent to his arrest. The time lapse between arrest and statement, here but a matter of moments, is, while important, admittedly not controlling. Instead our cases have shown an overriding concern lest a person who is arrested and taken into custody by the police, purportedly for purpose of prompt arraignment, be subjected instead to a detour, physical or temporal, taken for the purpose of eliciting a confession. Where an accused is arrested on the street, the officers may not interrupt their journey to the police station to begin interrogating him at the side of the road.[14] Nor may they begin such questioning as an interjection into the process of booking.[15] Recently this court has held that an officer who arrests a suspect on his assumption of probable cause for arrest is under a duty to take him to the magistrate and may not instead taken him to another officer whose purpose is to question the suspect in order to obtain evidence of guilt, Naples v. United States, 127 U.S.App.D.C. 249, 382 F.2d 465 (July 25, 1967).

Here, however, appellant was not arrested, nor was there probable cause to arrest him, until his statement at the police station that he had grabbed the woman. He was being questioned and asked to explain away items casting suspicion when he uttered the words that involved him with the deceased and led to his arrest. His clarification and elaboration concerning that involvement was part of a continuous narrative. The continuity of the statement would have been more obvious but no more real had the police officers permitted the interview to continue without any announcement. It would be unreasonable to declare that the continuation of the confession has been impaired merely because the officers took steps that were if anything helpful to the suspect by making an announcement of arrest and by renewing the warning that any statement could be used against him,

a warning that accords with the objectives of our jurisprudence.

■ The announcement and warning were neither intended nor reasonably understood as terminating the interview in fact, and we do not think they had that effect as a matter of law. This is not a case of an interruption or detour either to initiate or rearrange a questioning, as by bringing in a new questioner, or changing the scene. We do not say that the police could continue a prolonged probe after having grounds to arrest a man in the station house. But under circumstances where the questioning was not being initiated or rearranged but was rather being continued, and continued for a relatively brief extent that clarified and filled out a conclusory statement of involvement, we do not consider that the announcement and protective warning had the effect of terminating the interview.

■ We have given consideration to the possibility of ruling that with the significant change in status that took place with the arrest—depriving the suspect of freedom to leave the scene—the police lost all lawful right to ask further questions. There would be reason for such a blanket rule as providing the only certain assurance against questioning that is really intended only to elicit proof of guilt for trial purposes. But the protective rules of our jurisprudence have been fashioned so as to provide a maximum of protection without insisting on an absolute rigidity that interferes with fair needs of society in police administration. The fact that a defendant says something incriminating enough to require detention is not a warrant for sealing him off hermetically. There is the possibility of confusion and misunderstanding. Even in the case at bar the appellant's statement, though manifestly enough to warrant and indeed require compulsory detention, was blurred to some extent, as to just what it was appellant said he had done. There are

---

14. Greenwell v. United States, 119 U.S. App.D.C. 43, 336 F.2d 962 (1964).

15. Spriggs v. United States, 118 U.S.App. D.C. 248, 335 F.2d 283 (1964).

possibilities of prevarication, as well as confusion, that may warrant some continuation of the questioning. We think the balance of risks and protection is best achieved by putting a burden on the police who seek to justify questioning in the absence of protections, as the Court did in *Miranda* in permitting the police to show waiver of right to counsel. The general burden of showing that there was no unnecessary delay is reinforced by a specific burden of showing that the continuation of the pre-arrest questioning, without a break, was not merely to gather proof for the trial, but sought an elaboration for sake of clarity and certainty in relatively brief compass.

■ We would feel differently if we shared the premise of our dissenting colleague, that the officers took Fuller to the station house against his will with a view to obtaining a confession. But two judges, both with the opportunity to assess credibility, have found that this was not the case. Without comparable access to the witnesses, we do not feel justified in overturning their determination. The approval of the two judges is fairly indicated by the comment of the hearing judge that the questioning by the officers was "very fine police work." They did not specifically focus on that part of the questioning that followed the warning. The questioning was treated by both counsel and judges as essentially unified in time and purpose, terminated only when the officers came to prepare a written statement. Defense trial counsel argued that from its outset the questioning was in violation of *Mallory*. We do not require a remand for, in addition to the approval of the district judges already noted, our own consideration of the nature and significantly brief extent of the on-going questioning following the warning makes plain to us that it did not interject a taint condemning the conduct of the police officers as a disregard of Rule 5 and *Mallory*.

The significance of the *Mallory* rule has unquestionably been reduced as to trials since June 1966, which are governed by the requirement of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), guaranteeing the assistance of counsel to suspects questioned while in police custody. But insofar as we are now focusing on the rule excluding admissions from arrested persons who should previously have been brought before a magistrate and judicially advised of their rights, we see no basis for upsetting the determination of the District Court.

### B. *Lack of Counsel*

■ Every confession is obviously a critical confrontation between the accused and the state, where counsel could render valuable assistance. Miranda v. State of Arizona, 384 U.S. 436, 467–479, 86 S.Ct. 1602 (1966). The underlying doctrine was recently reiterated and extended to other confrontations in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). But this constitutional right to counsel was given only a prospective requirement. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Appellant was tried in 1965, and this court does not apply *Miranda* retroactively, see La Shine v. United States, 126 U.S.App. D.C. 71, 72 n. 1, 374 F.2d 285, 286 n. 1 (1967).

We turn to the question whether the confession was inadmissible in the light of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

*Massiah,* we think, has no bearing on the first confession. There the Court condemned the eliciting of statements, in clandestine fashion, from a man under indictment, without the presence of the lawyer he had already obtained.

■ Nor is the confession inadmissible under Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758 (1964). As elaborated in *Johnson,* 384 U.S. at 733 734, 86 S.Ct. 1772, the *Escobedo* decision rests on a group of factors (378 U.S. at

490–491, 84 S.Ct. 1758), amounting overall to a denial of counsel vitiating a confession: (1) the investigation has focused on a particular aspect; (2) he has been taken in police custody; (3) a process of interrogation lending itself to eliciting incriminating statements has been undertaken; (4) the suspect has requested and been denied the opportunity to consult with a lawyer; and (5) the police have not effectively warned him of his right to remain silent. Whether or to what extent the first three elements were present in appellant's case are questions that need not be resolved, for it is plain that under the facts as reliably found by the District Court neither of the last two objectionable elements infects this case.[16]

The fact that we have not extended *Escobedo* to the contours of *Miranda* for prospective application, and have not applied *Miranda* retrospectively, does not mean that we are indifferent to the need to strike a proper balance between the state and the criminal defendant. The Supreme Court's decisions on prospective and retrospective application are, indeed, a part of the balance struck. In addition, as will shortly appear, the Supreme Court keeps in mind, and so do we, that vigilance must be exercised to assure that the conduct of the agents of the State was sufficiently fair to retain convictions based on confessions at trials held prior to *Miranda*. The prosecution is required to make a showing that the confession was voluntary, and we now turn to the problem of voluntariness. With voluntariness established, we see no more reason for retroactively imposing a requirement of counsel in this case than in any other case involving confessions.

## C. *Voluntariness*

■ During the pre-trial hearing appellant's counsel stated that his motion to suppress the confession was based solely on an alleged violation of *Mallory*, and expressly disavowed any contention of lack of voluntariness. However, at the second hearing, during the trial, while the principal focus was again on *Mallory* problems, there was some incidental probing as to whether the investigating officers pressured appellant into making a confession. Because of the profound significance of the values protected by the rule excluding involuntary confessions, we have undertaken an independent canvass of the record to ascertain whether the prosecution established that this was a voluntary confession. In this regard we have been sensitive to the principle that even where *Miranda* is not accorded retroactive application, whether or not its four-fold prospective requirements were in fact met has a key bearing on the resolution of the abiding issue of whether a confession was voluntary. In 1966, shortly after *Johnson* decided that *Miranda* did not automatically control cases tried before its announcement, the Supreme Court cautioned, see Davis v. State of North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966):

> The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, the fact that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda,* is a significant factor in considering the voluntariness of statements later made.

Even though the requirements of *Miranda* are not "directly applicable" to a prior trial, they are "relevant on the issue of voluntariness." [17] We have made a careful appraisal of appellant's confession in light of these principles, but we are convinced that the prosecution established that his statements were "voluntary".

---

16. The motions judge rejected appellant's allegation that he asked in vain to be allowed to telephone his mother.

17. Clewis v. State of Texas, 386 U.S. 707, 709, 87 S.Ct. 1338, 1339, 18 L.Ed.2d 423 (1967).

We share the evident conclusions of both District Judges that even though appellant was not apprised at the beginning of the investigation that he was entitled to counsel, he was told he was not obliged to make any statement. Further, we find not the slightest basis for supposing that physical pressure was exerted. As to the possibility of psychological inducements made to overbear appellant's will, we are clear that no artifice was employed, no promises made. Appellant graduated from elementary school and dropped out in his second year of high school. He was questioned only for a matter of minutes before he acknowledged his guilt. The room provided by the Montgomery County authorities for the questioning was merely an unused office, furnished with leather chairs and a table, adjacent to the detective's squad room.

■ The question is whether the prosecution has established that appellant's will had not been overborne by the police officers. Although the extent of the burden on the prosecution was not articulated by the trial judge, and differences have been expressed in judicial opinions as to the appropriate standard,[18] this subject presents no problem in this case for his statements on the face of the record make it plain that the trial judge perceived no genuine possibility that the confession was not voluntary, and we see no basis for upsetting his conclusion.

### III APPELLANT'S SUBSEQUENT ADMISSION TO HIS MOTHER IN THE PRESENCE OF A DETECTIVE.

We think the District Court was correct in denying the motion to suppress the admission made by appellant to his mother.

At the outset we note that we do not consider and are not called upon to consider whether the admission to the mother would have been admissible if the prior confession were inadmissible. That would present the applicability of the doctrine that excludes an admission that is a fruit of the "poisonous tree." [19]

Considering by itself the admission made by appellant to his mother, we begin by pointing out that there is not the slightest suggestion that the police lured her there to evoke a further admission from appellant. The uncontested fact is that she went to Maryland on her own initiative. After extradition proceedings had been completed in Rockville, she asked the escorting officer whether she could speak with her son. The officer responded that he would have no objection, so long as they both realized that he would have to remain present. The officer testified that about five minutes earlier, when appellant was turned over to him for return to the District, he warned appellant of his rights. There was no request for privacy, either by appellant when he expressed the desire to see his mother, or by the mother when she came over. When the officer specifically indicated to appellant that he would have to remain present, appellant replied that would be all right. This same caveat was repeated when appellant's mother actually came over to them, and the officer's presence was not challenged or objected to. With the officer in attendance, appellant's mother asked him what he had done, and appellant repeated his prior admission that he had killed a woman and dropped his address book near the scene.

■ We do not find this officer's conduct shocking or unwarranted. Appellant was an accused murderer being returned to the District after waiving extradition. Appellant and his mother had a human right to talk to each other, which the officer granted, but appellant had no legal right to see his mother alone

---

18. See majority and concurring opinions in Clifton v. United States, 125 U.S. App.D.C. 257, 371 F.2d 354 (1906), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L. Ed.2d 341 (1967) and cases cited therein.

19. See Killough v. United States, 114 U.S. App.D.C. 305, 315 F.2d 241 (1962) (en banc).

at this time,[20] nor did either of them ask for a private place to talk. At the pre-trial hearing, when defense counsel sought to elicit from this officer that appellant was then certainly under arrest when he made the admission, was "in custody", and yet the officer insisted on listening to his conversation with his mother, the officer replied with the reasonable explanation: "That is why I stood by—because he was in my custody." This was not a surreptitious eavesdropping like that in *Massiah*. Both mother and son were aware of the presence of the officer. Appellant had been advised of his right to remain silent and of the fact that anything he might say could be used against him.

This court appreciates that "expanded concepts of fairness in obtaining confessions have been accompanied by a correspondingly greater complexity in determining whether an accused's will has been overborne." Jackson v. Denno, 378 U.S. 368, 390, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908 (1964). But we do not think the circumstances of the second admission were "unfair" so that it should be purged as being not truly voluntary.

 Of course garnering a confession by artifice is no more permissible than achieving the same result by some cruder coercion. Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954). Here there were no stratagems that reflected unfairness or vitiation of appellant's free will. The second admission was properly received in evidence.

## IV. The Seizure of Appellant's Clothing under Warrant.

Until appellant reached this court all of his efforts to suppress the bloody and incriminating garments seized under warrant were couched in terms of "fruit of the poisonous tree." The argument presented to the district judges at the two hearings was predicated on the contention that appellant's first confession at the Maryland police station was tainted, and that the inadmissibility of that confession rendered the clothing likewise inadmissible, since the supporting affidavit undeniably revealed that the officer was relying on the details of this statement as the basis for the averment that he was "positive" that the described apparel was to be found in appellant's home. But we have already agreed with both judges that the confession was not illegally obtained or suppressable.

 On appeal, counsel also argued that under cases like Gouled v. United States, 255 U.S. 298, 309, 41 S.Ct. 261, 65 L.Ed. 647 (1921), the principle became established that the Fourth Amendment barred the seizure of "mere evidence" of a crime and tolerated only the seizure of contraband and the fruits or instrumentalities of a crime. The vitality of that rule was drawn in question by Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and we called upon the parties for additional memoranda. While we were considering these, the Supreme Court granted review of Hayden v. Warden, 363 F.2d 647 (4th Cir. 1966), which promised to shine authoritative light on this troublesome question. We have held the case for that guidance.

On May 29, 1967, the Supreme Court released its opinion explicitly repudiating as out of step with sound notions of the policy of the Fourth Amendment, and its interrelation with the Fifth, any distinction based purely on superior proprietary interest in the objects of a search and seizure. Warden, Md. Penitentiary

---

**20.** There are obviously times when an accused has a constitutional right to talk to his counsel in private, and the police must arrange for security in such a way as does not infringe that right. There may also be times when an accused has a right to a "substitute counsel," *compare*

United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). But such privacy arrangements are not required when an officer is in the course of returning an accused who has been extradited.

v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). We regard *Hayden* as conclusive basis for rejecting appellant's argument that his constitutional rights were violated in August 1965 when officers procured a warrant to seize the blood-stained clothing that helped identify his connection with the murder.

We also asked the parties to provide memoranda on the question of the compatibility of this warrant with the requirements of Rule 41(b), FED.R.CRIM. P.[21] That Rule specifies that a warrant "may be issued under this rule to search for and seize any property (1) Stolen or embezzled in violation of the laws of the United States; or (2) Designed or intended for use or which is or has been used as the means of committing a criminal offense; or (3) Possessed, controlled, or designed or intended for use or which is or has been used in violation of" an irrelevant provision of the United States Code.

In stating what the printed affidavit specified were to be the "alleged grounds for search and seizure" the affiant officer inserted that the clothes were "instrumentalities" of the crime of first degree murder. There is no basis for disputing the bona fides of the application; it accords in substance with the approach used in United States v. Guido, 251 F.2d 1, 3–4, cert. denied, 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 843 (1958), where the Seventh Circuit justified the seizure of a bank robber's shoes as "instrumentalities" of the crime and noted that they were used to "get away" from the scene of the crime. The Supreme Court in *Hayden* indicated its awareness that "pressure against the [mere evidence] rule in the federal courts has tak-

en the form * * * of broadening the categories of evidence subject to seizure, thereby creating considerable confusion in the law." 387 U.S. at 309, 87 S.Ct. at 1651.

We do not decide now whether the clothing worn by a suspect at the scene of a crime may be part of the "means" of the crime within Rule 41(b) (2). Such a conclusion could be justified under a broad interpretation that considered the criminal's clothing at the scene of the crime to be the means of a crime, *e. g.* in cases where the clothing helped conceal identity, such as a hat pulled down, a coat pulled up, or both, or possibly a ski mask or stocking over the face, and also in cases where the clothing by being appropriate to the time and place avoids calling attention to the presence of the criminal.

We prefer to rest our decision on the ground that no objection was made in the trial court that Rule 41(b) (2) does not authorize a warrant for clothing worn at the scene of the crime. We do not consider this the type of deficiency that we should regard as plain error "affecting substantial rights" within Rule 52(a). No violation of a constitutional right is involved. And although the issue could be framed in terms of reliance on a statutory "right," the Supreme Court indicated in *Hayden* that the particular language "is attributable more to chance than considered judgment." 387 U.S. at 308, 87 S.Ct. at 1650, Rule 41, the Court pointed out, merely incorporated the categories then deemed within the ambit of constitutional seizures.[22]

In view of the ruling in *Hayden*, sustaining a warrantless search for and seizure of the clothing of the accused, it would be anomalous for this court to

21. According to Rule 54(a) (2), the rules applicable to Commissioners, including Rule 41 relating to the issuance of search warrants, also apply to proceedings before judges of the District of Columbia Court of General Sessions, one of whom issued this warrant. On the face of the application and the warrant appear references to the Federal Rules. And we note that while the provision in the D.C.

Code, Title 23, Section 301, dealing with the issuance of warrants is more detailed, its enumerations do not extend beyond the categories of Rule 41(b).

22. See LANDYNSKI, SEARCH AND SEIZURE AND THE SUPREME COURT 53–61, 82–84 (1966); CORNELIUS, THE LAW OF SEARCH AND SEIZURE 358–60 (2d ed. 1930).

suppress a search for particular clothing made only *after application to a magistrate for permission.* Justice Brennan's opinion for the Court in *Hayden* points out that the values protected by the Fourth Amendment are the right of privacy and the freedom from intrusion under indiscriminate general authority. "Protection of these interests was assured by prohibiting all 'unreasonable' searches and seizures, and by requiring the use of warrants, which particularly describe 'the place to be searched, and the persons or things to be seized', thereby interposing 'a magistrate between the citizen and the police.'" 387 U.S. at 301, 87 S.Ct. at 1647.

Assuming that a trial court must honor an objection to the seizure of clothing that is timely grounded on the wording of Rule 41(b) (2), this would permit the prosecution to conduct the trial with other admissible evidence. Permitting the objection to be raised on appeal would undo the trial. This would hardly be countenanced if an appellant raised for the first time on appeal the contention that evidence offered by the prosecution was not in accordance with, say, the book-entry statute.[23] This clothing evidence is reliable in nature, the kind of evidence permitting scientific analysis which the courts seek to encourage the police to use, in contrast with confessions of the accused. No fundamental right of privacy was invaded. This point is not "plain error affecting substantial rights" so much as a belated reliance on a statutory classification that at time of passage extended to all items that then appeared to be within the presumable legislative reach. While we do not say that the objection is a mere technicality that can be blandly ignored by a trial court,

we do not think the interest of justice requires that it be entertained for the first time on appeal.

### V

As to the rape conviction, we find no other grounds that merit discussion and conclude that the judgment on this count must be affirmed.

As to the judgment entered on the first degree murder verdict, however, the court is, sua sponte, ordering rehearing en banc of the issue presented by the contention that the trial court committed reversible error in failing to instruct the jury that it could not convict both on count one, charging first degree felony-murder, and on count two, charging second degree murder (as reduced by the trial court from a charge of first degree premeditated murder).[24]

Entry of the order affirming the conviction of rape will be stayed pending determination of this question.

So ordered.

FAHY, Circuit Judge (dissenting):

Whether or not there was error in the instruction by reason of our decision in Naples v. United States, 120 U.S.App. D.C. 123, 131, 344 F.2d 508, 516, must await the en banc hearing referred to by the court. I accordingly limit my opinion to consideration of the confessions. I find reversible error in this connection. There are, in my view, three confessions involved in this case—appellant's oral statement that he "grabbed the woman," made before formal arrest, his oral statement after the formal arrest, detailing the account of the crime, and his oral statement made the next day to his mother in the presence of a policeman. The first two confessions were made during

---

23. 28 U.S.C. § 1732 (1964).

24. The jury found appellant guilty of first degree murder on count one, and of manslaughter on count two. Appellant contends that the charges as given violates the instruction in Naples v. United States, 120 U.S.App.D.C. 123, 131, 344 F.2d 508, 516 (1964).

 In *Naples* a division of this court, in reversing a judgment on a verdict finding defendant guilty of both first degree felony-murder and second degree murder, held that a substantial right of defendant had been prejudiced because the trial court "erred in refusing to instruct the jury that it could not find appellant guilty of both first degree and second degree murder."

secret in-custody interrogation, and, according to the testimony of Detective Alexander, who assisted in this, it was not until appellant had twice confessed that he was told of his right to counsel, whereupon he refused to sign the prepared written statement, saying "he'd sooner talk to a lawyer." [1] Under Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 694, these two confessions are compelled self-incriminations, obtained in violation of the Fifth Amendment and inadmissible, unless *Miranda* does not apply because this case was tried prior to that decision. In Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 decided one week after *Miranda*, the Court held that the principles of *Miranda* need be given only prospective effect; but the Court added:

> We recognize that certain state courts have perceived the implications of *Escobedo* [v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977] and have therefore anticipated our holding in *Miranda*. Of course, States are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is required by this decision.

384 U.S. at 733, 86 S.Ct. at 1781.

*Miranda* and *Escobedo* were state cases, and the decision of the Court not to require their application to cases previously tried was influenced by considerations affecting the administration of criminal justice in the States, with slight pertinence in this jurisdiction. LaShine v. United States, 126 U.S.App.D.C. 71, 374 F.2d 285, 291 (dissenting opinion). See *Johnson,* supra, 384 U.S. at 731, 86 S.Ct. at 1780, where the Court pointed out, "Prior to *Escobedo* and *Miranda,* few States were under any enforced compulsion on account of local law to grant requests for the assistance of counsel or

to advise accused persons of their privilege against self-incrimination."

Moreover, I can fairly say that the implications of *Escobedo,* insofar as here relevant, were anticipated in my dissenting opinion in Jackson v. United States, 119 U.S.App.D.C. 100, 105, 337 F.2d 136, 141, cert. denied, 380 U.S. 935, 85 S.Ct. 944, 13 L.Ed.2d 822. For this reason also, as well as for reasons elaborated in my dissent in LaShine v. United States, *supra,* I think I am free, notwithstanding Johnson v. State of New Jersey, to say that *Miranda* should be applied to this federal case which was pending on this direct appeal when *Miranda* was decided.

It seems to me, moreover, that the detailed confession—and perhaps the initial one "[I] grabbed the woman," though in view of the court's position I need not decide that—is inadmissible under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. *Wade* brings the Sixth Amendment right to the assistance of counsel to another kind of pre-trial confrontation, a line-up identification. In Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, decided the same day, however, this constitutional ruling was held not to be retroactive. Therefore, were a problem of line-up identification involved in the present case, *Wade* would not govern it. But we are not concerned with such an identification. We are concerned with confessions obtained during in-custody interrogation, after *Escobedo,* from a twenty-one year old man having a very abbreviated education, an I.Q. making him unacceptable for military service, and no prior criminal record or experience with the police. During the interrogation he was under "strong suspicion"—the officer's words—of having committed a terrible crime. He was without counsel, judge or jury. He had confessed fully when he was advised of the right to counsel, altogether ineffectively in the circumstances. The case against him in all essentials was complet-

---

1. After this refusal the officers were able to obtain a written statement affirming the truth of appellant's oral confession.

This was suppressed at the pre-trial hearing of appellant's motion to suppress for violation of the *Mallory* rule.

ed by the pre-trial confessions obtained at the police station. The public trial which later occurred, following his plea of not guilty, was little more than a formality. Peculiarly applicable is the following from the opinion in *Wade:*

> [T]oday's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality.

The Court proceeded:

> In recognition of these realities of modern criminal prosecution, our cases have construed the Sixth Amendment guarantee to apply to "critical" stages of the proceedings. The guarantee reads: "In all criminal prosecutions, the accused shall enjoy the right * * to have the Assistance of Counsel *for his defence.*" The plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful "defence."

*Wade, supra,* 388 U.S. at 224–225, 87 S.Ct. at 1931. (Italics in Court's opinion.)

It is obvious that the secret in-custody interrogation, aided by the address book pressed upon the accused after he denied complicity in the crime,[2] was a critical stage of the proceedings. It was, in fact, the decisive stage. Even assuming the inapplicability of *Miranda,* the applicability of *Wade* is not therefore precluded. *Miranda* rests upon the Fifth Amendment privilege. *Wade* rests upon a more inclusive principle, "established as long ago as Powell v. State of Alabama," 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, and,

> It is central to that principle that in addition to counsel's presence at trial,[4] the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate the accused's right to a fair trial.[5] The

security of that right is as much the aim of the right to counsel as it is of the other guarantees of the Sixth Amendment—the right of the accused to a speedy and public trial by an impartial jury, his right to be informed of the nature and cause of the accusation, and his right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor. The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution. Cf. Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923.

> In sum, the principle of Powell v. Alabama and succeeding cases requires that we scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

*Wade, supra,* at 226–227, 87 S.Ct. at 1932 (footnotes omitted).

The extension by *Wade* of the Sixth Amendment right to counsel to pre-trial identification, with qualifications not here material, was a new application of the right, though one Court of Appeals recently had made the same ruling. Wade v. United States, 358 F.2d 557 (5th Cir.). But the principle was not new, as is demonstrated by the above quotations from the Court's opinion. Non-retroactivity was based on the newness of the application of the principle, not on an enunciation of a new constitutional principle. The basis for the non-retroac-

---

**2.** "He stated he didn't know anything about it. We showed him a red address book, asked—"; again, "His first re-

mark * * * was that he didn't know what we were talking about."

tive ruling, therefore, does not exist in our case of confessions obtained by secret in-custody interrogation of an accused without counsel. ·This critical stage of the criminal proceedings requires under *Wade* the assistance of counsel, as guaranteed by the Sixth Amendment, to protect the fairness of the trial, not, as in *Miranda,* to protect alone the privilege of the Fifth Amendment, nor, as in *Escobedo,* shorn of its implications, to enable the accused to have access to his counsel as requested. Should Johnson v. State of New Jersey nevertheless preclude the application of *Wade* to this "confession" case tried before *Miranda* but subsequent to Powell v. State of Alabama and *Escobedo?* In view of the "fair trial" principle in relation to the right to counsel exposited in *Wade,* and the pertinence of that principle to "confession" cases as distinguished from those of pre-trial identification, do we not have here an entirely fresh question of retroactivity, not decided by Johnson v. State of New Jersey? Whatever the answer to these questions, *Wade* fortifies me in my view that, within the latitude allowed by Johnson v. State of New Jersey, *Miranda* itself should be applied in this federal jurisdiction to this case. See, again, my dissents in *Jackson* and *LaShine,* both *supra.*

I would also reverse and remand for a new trial on the basis of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, for the admission of the detailed confession, if error, is reversible error. Not only was it introduced before the jury, it led to the search and consequent seizure of damaging evidence used at trial. And even if the initial confession, "[I] grabbed the woman on the street," was admissible under *Mallory* as made prior to arrest, it is reversible error, as I understand is conceded, to have admitted the detailed confession if it were inadmissible. See Cunningham v. United States, 119 U.S.App.D.C. 262, 340 F.2d 787; Watson v. United States,

98 U.S.App.D.C. 221, 234 F.2d 42. I think it was inadmissible under *Mallory,* for reasons now to be stated.

There is no dispute that when first questioned about the crime the officers regarded Fuller as a suspect. The investigation had focused upon him. At the pre-trial hearing on the motion to suppress, Officer Boyd, who led in the questioning, was asked, "But you had a good idea it was the defendant, didn't you?" He responded, " * * * we had a strong suspicion since his address book was found on the scene that it had been him, yes, sir." [3] There is no dispute, also, that when first questioned the suspect denied complicity. "Now, when you walked in that room, he denied any implication, didn't he, at first when you first talked to him? A. [Officer Boyd] His first remark to that respect was that he didn't know what we were talking about." In Officer Boyd's testimony before the jury this appears:

We all walked over to a table and took seats. Detective Alexander sat across the table from me and Fuller sat on the end of the table.

Q. And what did you say to the Defendant Fuller?

A. We told him that we wanted to talk to him about a woman being slain in the District.

He stated he didn't know anything about it. We showed him a red address book, asked—

After further questioning the officer testified Fuller stated "that yes, he was the man who—that he had grabbed the woman on the street." The officer continued:

I then told him he was going to be held and he was charged with the crime, that anything that he told us would be used against him; asked him if he wanted to tell us about the crime in detail. He started at that time and went through it step by step, and this

---

3. It is of no significance that in response to an immediately following question by the court he said he did not at that time

have enough probable cause to arrest defendant.

conversation took from 15 to 20 minutes.

Some twenty hours later appellant was taken before a magistrate.

The court puts aside *Mallory* by holding that once the confession was begun— "[I] grabbed the woman on the street" —the police were not required to interrupt it and comply with Rule 5(a),[4] citing Walton v. United States, 334 F.2d 343 (10th Cir.), cert. denied, 379 U.S. 991, 85 S.Ct. 706, 13 L.Ed.2d 612, which in turn cites United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140; and our cases Perry v. United States, 102 U.S.App.D.C. 315, 253 F.2d 337, cert. denied, 356 U.S. 941, 78 S.Ct. 785, 2 L.Ed. 2d 816 and Gardiner v. United States, 116 U.S.App.D.C. 270, 323 F.2d 275, cert. denied, 375 U.S. 976, 84 S.Ct. 495, 11 L.Ed.2d 421. In *Walton* it does not appear when the arrest first occurred. Moreover, there was never a denial by Walton of complicity.

None of the above cases presents the problem we have here. All may be characterized as "threshold confession" cases. In distinguishing them I rely upon the principle that the *Mallory* rule has greater efficacy than a bare holding that the arrestee must be taken before a magistrate without unnecessary delay. In administering the rule the courts are required to protect it from being rendered ineffective by evasions which defeat its purpose. Spriggs v. United States, 118 U.S.App.D.C. 248, 335 F.2d 283.

When the initial confession was made the continuity of the confessions was carefully broken by the officers themselves by changing the status of the suspect to that of an arrested accused.

Their testimony shows they were at pains to stress the absence of an arrest before the initial confession. They stressed that they interrupted the accused after this initial confession, charged him, and warned him. This course of conduct no doubt was due to the desire of the officers to emphasize that when they first began to question the accused, *Mallory* did not apply because they had made no arrest. While the time was short between the formal arrest[5] and the further questioning which elicited the detailed confession, if the confession is not brought within *Mallory,* notwithstanding the argument there was no "unnecessary delay" after the arrest, *Mallory* is evaded. The prosecution cannot, consistently with *Mallory,* obtain a confession by secret in-custody interrogation prior to arrest, then immediately arrest the suspect, resume the secret interrogation, elicit then another and more detailed confession, and use the no "unnecessary delay" feature of Rule 5(a) to render this later confession admissible on the theory of continuity in the making of the confessions. If a continuity theory is to be relied upon, then the whole period of questioning, including that before the arrest, must be considered. In passing upon the admissibility of self-incriminating statements obtained by secret police interrogation, when except for the formalities the trial occurs, it is unacceptable to me to consider *Mallory* by departmentalizing the period of the secret interrogation, breaking it by an arrest for the purpose only of calculating "unnecessary delay" after the arrest, but not breaking it at all in determining that the confession was continuous.[6] If the con-

---

4. I assume without deciding that the court properly assimilates Rule 5(a) to Rule 40, the latter here applying.

5. The opinion of the court states the District of Columbia detectives were aware that in Maryland it was necessary to call on the Maryland police to make the arrest; yet the opinion accepts the view that the detectives made the arrest, when appellant said he "grabbed the woman."

6. As may be seen from the analysis of the facts bearing upon the confessions the ultimate question of their admissibility draws upon the principles enunciated in *Mallory, Escobedo, Miranda* and *Wade.* It should not be necessary in determining the issue of admissibility to consider separately the application of each of these cases to separate phases of a continuous course of conduct. The totality of their impact should be the basis of decision. It seems to me that the Supreme

fession is to be considered as uninterrupted then the issue of its admissibility must take account of the period of interrogation before the confession began.[7]

Moreover, I find the continuity theory applied here inconsistent with this court's recent decision in Naples v. United States, 127 U.S.App.D.C. 249, 382 F.2d 465. It is clear that the police had abundant probable cause when they admittedly arrested appellant and as stated in *Naples,* 382 F.2d at 471,

> It is the function of the police to investigate crime, to arrest when there is probable cause to do so, and to put the prisoner in the channels leading to his prosecution. It is not the function of the police to convict. And it is the purpose of Rule 5(a) to draw a line between these functions.

Nevertheless, the officers in this case renewed the interrogation, asking the arrestee "if he wanted to tell us about the crime in detail." The delay created thereby was unnecessary in the full factual setting of this interrogation, and as I read the record the delay was for the purpose of further insuring a conviction. As emphasized in *Naples,* 382 F.2d at 474, "the *purpose* of the interrogation, whether it be long or short, can never be anything but critical. That purpose is \* \* \* the crucial fact in measuring the reasonableness of delay in presentment after arrest." [8]

The court states that the "maximum of protection" furnished by our protective rules is not so absolutely rigid as to interfere with the fair needs of society in police administration. But I think such rules, fair to society, do not permit the admission in evidence at trial of the detailed oral confession in this case. The court clothes that confession with admissibility within the rules on a theory that self-incrimination brought about by secret in-custody interrogation by police of a suspect after his arrest may avoid confusion and misunderstanding possibly attributable to something of an incriminating nature previously elicited from the arrestee. I urge that a desire for clarification is not a criterion by which to judge the admissibility at a subsequent trial of a confession obtained by such interrogation of an arrestee without counsel or effective waiver of the right to counsel. The imposing structure of decisions—*Mallory, Escobedo, Miranda, Wade*—does not remotely suggest the acceptability of such a criterion which, indeed, would undermine the rules delineated by those decisions. While *Naples* emphasizes the relative importance of purpose, compared with the time involved in the interrogation, an innocent purpose —clarification—cannot render admissible a confession which factors other than purpose would render inadmissible.

The court places upon the police the burden of proving the innocence of the purpose. Yet the court holds the confession properly admitted at this trial although neither of the two judges who passed upon its admissibility followed the standard of proof now first announced. One judge considered only the quantum of time involved in "unnecessary delay" and the concern of the other judge was whether Fuller had been arrested when he was brought to the police station.[9]

---

Court has concluded in these cases considered together that when an accused decides to stand trial rather than plead guilty he is not to be convicted on the basis of a previous non-public trial by the police, without counsel, judge or jury.

7. It is no injustice to the defectives for me to say that it is unrealistic to accept the view that appellant in being questioned by them was merely "asked to explain away items casting suspicion when he uttered the words that involved him with the deceased and led to his arrest."

I think he was questioned to obtain a confession.

8. The purpose of the officers in this case appears from such facts as the renewal of the interrogation after arrest, the attempt to have appellant sign a written version of his detailed oral confession, and, upon Fuller's refusal to do so, the securing of a written statement affirming the truth of the oral confession.

9. My premise is not, as the court suggests, that Fuller was taken to the sta-

\* \* \* \* \* \*

*Mallory* itself, years before *Escobedo*, *Miranda* and *Wade*, opposes, it seems to me, the present approach of the court:

> The arrested person may, of course, be "booked" by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.

> In every case where the police resort to interrogation of an arrested person and secure a confession, they may well claim, and quite sincerely, that they were merely trying to check on information given by him. Against such a claim and the evil potentialities of the practice for which it is urged stands Rule 5(a) as a barrier.

354 U.S. at 455-456, 77 S.Ct. at 1359-1360.

As to whether or not the confessions were voluntary suffice it to say that under *Miranda* the confessions were not voluntary. They were compelled self-incriminations. The holding of our court that *Miranda* does not require their exclusion as involuntary because of the non-retroactive ruling in Johnson v. State of New Jersey, does not mean that the confessions were voluntary.

As to the search and seizure, the search warrant rests upon the detailed confession. Were that confession in my opinion admissible I would agree, for the reasons set forth in Part IV of the court's opinion, that the admission in evidence of the articles seized did not constitute plain error affecting substantial rights.

I respectfully dissent.

## On Rehearing En Banc

Before BAZELON, Chief Judge, and FAHY, Senior Circuit Judge, and DANAHER, BURGER, WRIGHT, McGOWAN, TAMM, LEVENTHAL and ROBINSON, Circuit Judges, sitting *en banc.*

LEVENTHAL, Circuit Judge:

Appellant Fuller was prosecuted on a three count indictment. Count I charged first degree felony-murder, Count II charged first degree premeditated murder, and Count III charged rape. All the counts arose from the same crime. At his trial he was convicted of first degree murder on Count I, of manslaughter as a lesser included offense on Count II, and of rape. His appeal raised numerous contentions that his rights had been violated by police conduct before and after arrest. A division of the court resolved those contentions against him, and upheld his conviction of rape.[1] Appellant urges that those issues were decided incorrectly by the division. After considering appellant's contentions, the court en banc has decided not to grant rehearing as to those issues. On those questions, therefore, the opinion of the panel issued November 29, 1967 stands.

On the appeal counsel also argued that the homicide convictions must be reversed because the trial judge's charge was erroneous. The trial judge submitted two homicide counts to the jury: Count I charging first degree felony-murder; and Count II, charging second degree murder, as reduced by the trial judge from the first degree premeditated murder charged in the indictment.

Appellant's counsel contend that the judge erred in instructing the jury to render a verdict on each count, and in failing to instruct them that these were alternative counts, and that a verdict of guilty on Count I prohibited a verdict of guilty on Count II and vice versa.[2] That contention is based on the authority of Naples v. United States, 120 U.S.App. D.C. 123, 131, 344 F.2d 508, 516 (1964) (*Naples II*), where a division of this court held, one judge dissenting, that it

---

tion against his will. I do conclude, however, that he was taken there, as in fact eventuated, to obtain a confession.

1. See, ante, p. 1204.

2. *See, e.g.,* charge quoted below in note 7.

was prejudicial error to refuse to instruct that the jury could not find the defendant guilty of both first and second degree murder.

Although appellant's trial counsel made no objection to the trial judge's charge as given, it is argued that the giving of a charge defined as "prejudicial error" (in *Naples II*) is also "plain error" [3] that must be reversed on appeal.

On the same day that the division issued its opinion rejecting appellant's other claims, the court en banc set for en banc consideration and determination the sole question whether "the trial court committed reversible error in failing to instruct the jury that it could not convict both on Count I, charging first degree felony-murder, and on Count II, charging second degree murder (as reduced by the trial court from a charge of premeditated murder)."

In *Naples II*, the court held that the first and second degree murder statutes [4] read together made clear "that a single offense cannot be both first and second degree murder." [5] And, "since the jury found appellant guilty on both counts," [6] the refusal to charge in the alternative was held prejudicial error. The division did not spell out the precise charge the trial judge was required to give when submitting both first and second degree murder to the jury. The clear implication of *Naples II*, however, is that the jury must be charged to find the defendant not guilty of second degree murder if he is found guilty of first degree murder. Thus, the majority did not dispute the accuracy of this reading of its intention by the dissenting judge. Moreover, the understanding that the conviction on one count requires acquittal on the other has been explicitly set forth in a responsible effort by the bar to provide a guide of standardized instructions.[7] Taking this as the intention of the court in *Naples II*, we overrule this aspect of that opinion for the reasons set forth in Part I of this opinion en banc. In Part II we point out that defendant would, on timely request, have been entitled to an instruction different from that given by the trial judge, but also different from that contemplated in *Naples II*.

## I

1. *Naples II* is premised on a theory that first and second degree murder are

3. In capital cases, the court is particularly likely to find "plain error" when the error is substantial enough to constitute prejudicial error. See, e. g., Tatum v. United States, 88 U.S.App.D.C. 386, 190 F.2d 612 (1951), and cases cited at 88 U.S.App.D.C. 388 n. 3, 190 F.2d 614 n. 3.

4. 22–2401. Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–401 or 22–402, rape, mayhem, robbery, or kidnapping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree.

22–2402. Whoever maliciously places an obstruction upon a railroad or street railroad, or displaces or injures anything appertaining thereto, or does any other act with intent to endanger the passage of any locomotive or car, and thereby occasions the death of another, is guilty of murder in the first degree.

22–2403. Whoever with malice aforethought, except as provided in sections 22–2401, 22–2402, kills another, is guilty of murder in the second degree.

5. 120 U.S.App.D.C. at 132, 344 F.2d at 517.

6. 120 U.S.App.D.C. at 131, 344 F.2d at 516.

7. See Instruction #87, Criminal Jury Instructions prepared by the Junior Bar Section of the District of Columbia Bar Association (1966): "You may not find the defendant guilty of both murder in the first degree and murder in the second degree. If you find the defendant guilty of murder in the first degree, you must find him not guilty of murder in the second degree. If you find the defendant guilty of murder in the second degree, you must find him not guilty of murder in the first degree."

distinct and inconsistent offenses. We therefore start by considering under what circumstances the jury may not convict of two distinct offenses arising out of the same factual situation.

 Sound doctrine generally permits jury convictions of legally distinct offenses, but precludes a jury verdict finding a defendant guilty of two offenses that are inconsistent with each other as a matter of law.[8] Where such inconsistency is present the jury should be charged in the alternative—to convict of one offense or the other, but not both. Such a charge heightens the jury's understanding of the separate legal requisites for each offense. To determine whether the relation between particular offenses mandates application of an alternative charge requires investigation of the common law and statutory background of the crimes.

A familiar example of inconsistency is that of the common law offenses of larceny and receiving stolen goods. At common law a defendant could not be convicted at the same time for both larceny and receiving, because an element of the crime of receiving is that the goods be "received" from another person after they are stolen. A thief cannot receive from himself. This inconsistency precluded verdicts of guilty as to both offenses,[9] and this bar was maintained when essentially these same offenses have been statutorily defined.[10]

Another example of inconsistency is carnal knowledge, made criminal by 22 D.C.Code § 2801, and taking indecent liberties with a child, made criminal by the Miller Act.[11] Here the inconsistency results from the Miller Act's express exclusion[12] of crimes of carnal knowledge from the area that the Miller Act—with its liberalized parole and release procedures—was designed to cover. Here too, the jury must be told that they may not find the defendant guilty of both offenses. If he is guilty of carnal knowledge, he is not within the Miller Act.[13]

 2. In appellant's case, we are dealing with criminal homicides. We begin our analysis with consideration of the case as of the time of the indictment. There was no anomaly in indicting appellant for both first degree premeditated murder and first degree felony-

8. *See, e.g.,* Milanovich v. United States, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961); Dozier v. United States, 127 U.S.App.D.C. 266, 382 F.2d 482 (1967); Thompson v. United States, 97 U.S.App. D.C. 116, 228 F.2d 463 (1955). Compare, where verdicts on two counts inconsistent as a matter of fact, Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L. Ed. 356 (1932) (Holmes, J.); Bickel, Judge and Jury—Inconsistent Verdicts in the Federal Courts, 63 Harv.L.Rev. 649 (1950).

9. *E.g.,* Commonwealth v. Haskins, 128 Mass. 60 (1880); Perry v. Martin, 73 N.J.L. 310, 62 A. 1001 (1906). At common law the rule is not merely a prohibition of conviction of both offenses. If the accused were guilty of the theft he could not be convicted of the receiving, regardless of whether the indictment contained a larceny count. *E.g.,* Reg. v. Perkins, 5 Cox C.C. 554, 169 Eng.Reprints 582 (1852); Rex. v. Owen, 168 Eng.Reprints 1200 (1825). The difficult situation is where the "receiver" is also an accessory before the fact, and therefore liable as a principal. On these facts the

cases have split, some holding that the defendant may be convicted only of larceny, Reg. v. Perkins, *supra,* others that he may be convicted of both offenses, Weisberg v. United States, 49 App.D.C. 28, 258 F. 284 (1919), and still others apparently holding that he may be convicted of either offense but the jury must choose between them, Milanovich v. United States, *supra* note 8.

10. Milanovich v. United States, *supra* note 8.

11. 22 D.C.Code § 3501.

12. 22 D.C.Code § 3501(d): "The provisions of this section shall not apply to the offenses covered by section 22–2801."

13. Dozier v. United States, *supra* note 8; Whittaker v. United States, 108 U.S.App. D.C. 268, 281 F.2d 631 (1960); Younger v. United States, 105 U.S.App.D.C. 51, 263 F.2d 735, cert. denied, 360 U.S. 905, 79 S.Ct. 1289, 3 L.Ed.2d 1257 (1959); Thompson v. United States, *supra* note 8. But compare the disposition of Dozier v. United States, *supra,* with that of Milanovich v. United States, *supra.*

murder. The offenses are distinct in the sense that they have different elements.[14] One requires that the slaying be done with "deliberate and premeditated malice," the other requires that the killing occur in the course of certain enumerated felonies. The same slaying could be both: It could both occur during the course of a rape, and also be the product of the killer's deliberate and premeditated act.

3. Obviously there is a need to be careful to prevent injustice when what is essentially a single course of conduct may be prosecuted as more than one offense, under more than statutory provision. Such injustice is obviated by the rule prohibiting the imposition of consecutive sentences, in appropriate cases, even when the defendant has committed two or more legally distinct offenses.[15] Of course, a defendant committing a single homicide cannot be given consecutive sentences for both first degree murder and another crime of homicide.[16] However, the fact that punishments may not be cumulative

plainly does not mean that multiple convictions are impermissible. This is quite clear from our opinions.[17] Insofar as *Naples II* implies to the contrary,[18] it is disapproved.

There are sound reasons for permitting the jury to render verdicts as to separate offenses even where consecutive sentences are not permitted. For example, in the murder situation, a prosecutor should be permitted to proceed on both first degree murder theories. Perhaps the jury will believe one and not the other, and perhaps the jury will believe both. We see no reason for a rule of law that would require the prosecutor to elect between the offenses before the case is sent to the jury. Nor do we see why the jury must elect. Permitting a guilty verdict on each count— if warranted by the facts—may serve the useful purpose of avoiding retrials by permitting an appellate court, or a trial court on further reflection, to uphold a conviction where- there is error concerning one of the counts that does not infect the other. Moreover, that

---

14. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

15. The former rule of Blockburger v. United States, *supra* note 14, that separate offenses could be punishable by consecutive sentences, is clearly too broad in view of subsequent Supreme Court decisions, *e.g.*, Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957). This court's most recent formulation of the considerations to control whether sentences may be cumulated does not rely merely on the evidentiary requirements of proving each offense. Irby v. United States, 129 U.S.App.D.C. 17, 390 F.2d 432 (1967) (en banc).

Multiple violations also raise substantial problems in the context of double jeopardy, *i.e.*, when acquittal on conviction of one offense will bar prosecution for another "offense" that is part of the same transaction. *See* note 26 *infra*.

16. The punishment for first degree murder must be either death or life imprisonment. 22 D.C.Code § 2404. Prior to 1962 amendment, Act of March 22, 1962, 76 Stat. 46, the death sentence was mandatory. Johnson v. United States, 225 U.S. 405, 32 S.Ct. 748, 56 L.Ed. 1142 (1912)

(jury has no power to recommend life imprisonment).

17. Evans v. United States, 98 U.S.App. D.C. 122, 123, 232 F.2d 379, 380 (1956), *citing* Ekberg v. United States, 167 F.2d 380 (1st Cir. 1926); Davenport v. United States, 122 U.S.App.D.C. 344, 353 F. 2d 882 (1965).

Decisions by state courts likewise hold that there is no prejudicial error in simultaneous convictions of two offenses even though they may not be punished by consecutive sentences, or are in fact merely different degrees of the same offense, *see, e. g.*, Wildman v. State, 42 Ala. App. 357, 165 So.2d 396 (1963); State v. Boodry, 96 Ariz. 259, 394 P.2d 196, 379 U.S. 949, 85 S.Ct. 448, 13 L.Ed.2d 546 (1964); People v. McFarland, 58 Cal.2d 748, 26 Cal.Rptr. 473, 376 P.2d 449 (1962); State v. Riley, 28 N.J. 188, 145 A.2d 601 (1958); State v. Quintana, 69 N.M. 51, 364 P.2d 120 (1961); People ex rel. Maurer v. Jackson, 2 N.Y.2d 259, 159 N.Y.S.2d 203, 140 N.E.2d 282 (1957); Commonwealth ex rel. Shaddock v. Ashe, 340 Pa. 286, 17 A.2d 190 (1941).

18. 120 U.S.App.D.C. at 132, 344 F.2d at 517.

course precludes a range of double jeopardy contentions.[19]

There is no general reason why the jury should not be permitted to render a verdict on each theory, so long as the offenses are not in conflict and no aspect of the case gives reasonable indication that the jury might be confused or led astray.

4. With these general principles as background, we come to the situation that developed in appellant's trial when the judge reduced Count II from first degree premeditated murder to second degree murder. This brings us to the relationship between the offenses of first degree felony-murder and second degree murder.

In *Naples II* the division focused on 22 D.C.Code § 2403, as making clear that "a single offense cannot be both first and second degree murder." That section contains the definition of second degree murder: "Whoever with malice aforethought, except as provided in sections 22–2401, 22–2402, kills another is guilty of murder in the second degree." The division, relying on the "except" clause held that if a crime were within D.C.Code § 22–2401 or § 22–2402 (which sections define first degree murder) it must therefore and necessarily be outside of the second degree definition (§ 22–2403).

We think that construction unsound. It is not compelled by logic. It is contrary to the history and purpose of the statutory provisions defining the crimes of first and second degree murder. These were enacted in substantially their present form in 1901.[20] The use of different degrees of the statutory crime was made against the background of the

---

19. Suppose the jury were required to register an acquittal of premeditated murder, because they convicted defendant of first degree felony-murder. Suppose the felony-murder conviction is later reversed for insufficient evidence as to the felony. Defendant would argue that he could not be retried for premeditated murder because the jury convened to consider that charge, to whose verdict he was entitled, had brought in a verdict of acquittal. Cf. Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); Downum v. United States, 372 U.S. 734, 83 S. Ct. 1033, 10 L.Ed.2d 100 (1963).

Similar problems are raised if, as the dissent contends, first and second degree murder are distinct and different offenses, and a *Naples II* charge, see note 7 *supra*, has been given. A defendant convicted of first degree felony-murder, and therefore automatically acquitted of second degree murder, might appeal on the grounds that the evidence will not support the felony conviction, e.g., that he was too intoxicated to have the specific intent to rob. If he prevailed in the appellate court, he could, on retrial contend that the jury verdict of acquittal of second degree murder bars any second trial for that crime, even though intoxication does not negative the "malice" required for that crime.

The dissent suggests that the jury can be told to withhold decision and "abstain" on the second degree count if it convicts on the felony murder charge. If, how-

ever, the crimes are "inconsistent" as stated in *Naples* and reiterated in the dissent, it is unlikely that this device would avoid the double jeopardy problem in view of the overtones of the *Downum* and *Green* decisions. Moreover, the approach of the dissent would not enable defendant to gain the protection of the double jeopardy clause, available under the court's decision, by obtaining a verdict from a jury making a rational judgment applying the law of second degree murder to the evidence produced at this trial, possibly at great expense, possibly from exculpatory witnesses who will never be available again. (*See* point 8, below, and particularly paragraph containing footnotes 44–46.)

20. Ch. 854, §§ 798, 799, 800, 31 Stat. 1321 (1901). The first degree statute was amended by Act of June 12, 1940, 54 Stat. 347, to make a non-purposeful killing in the course of certain felonies first degree murder. Prior to that the felony-murder rule extended only to purposeful killings in the course of a felony. *See* Jordon v. United States, 66 App.D.C. 309, 87 F.2d 64 (1936); Marcus v. United States, 66 App.D.C. 298, 86 F.2d 854 (1936); Letter of Attorney General Cummings, December 30, 1938, to Senate Committee on the Judiciary, printed as an appendix to Coleman v. United States, 111 U.S.App.D.C. 210, 220–221, 295 F.2d 555, 565–566 (1961) (en banc), cert. denied, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed. 2d 613 (1962).

**1226**

common law crime of murder [21] which embraced any killing with malice aforethought.[22] Congress, modifying the common law rule that all murders were punishable by death, singled out certain types of killings (first degree murder) as meriting the possibility of capital punishment. Second degree murder was defined as the residuum of the common law crime of murder, i. e. a killing with malice aforethought. This is a common statutory pattern.[23]

■ The purpose and effect of the dichotomy,[24] and of the "except" clause in our Code, was to say this: All homicides with malice are murder under the statute, as at common law; they are punishable by the maximum of life imprisonment set forth for murder in the second degree, except that those particularly heinous murders that are listed in the first degree section are punishable capitally.

■ The "except" clause of § 2403, inserted to permit certain heinous murders to be punished more severely, did

not result in a definition that persons committing such heinous murders are not guilty of second degree murder. Certainly it could not be seriously asserted that a person indicted solely for second degree murder would have a valid defense if it should be established that the murder was premeditated.[25] The second degree statute cannot be taken as defining the substantive offense of second degree murder so as to exclude therefrom all crimes that also come within the first degree murder statutes.

■■ We conclude that the statutory definition of the crimes of first and second degree murder does not impel a requirement that they be charged in the alternative. Their substantive elements do not conflict. A jury verdict of guilty as to both permits no inference that the jurors have stumbled in fitting the instructions concerning the elements of each offense to the facts as they have been determined by them. Without such inconsistency or confusion, there is no need for an alternative charge such as

21. Prior to the adoption of the District of Columbia Code in 1901, the common law of crimes was operative in the District. The Act of February 27, 1801, 2 Stat. 103, made the laws of Virginia and Maryland operative in the parts of the District they had ceded. The Act of March 2, 1831, 4 Stat. 448, provided penalties for various offenses, but "all definitions and descriptions of crimes" were to remain as theretofore. See Hill v. United States, 22 App.D.C. 395 (1903).

22. "Murder is, therefore, now thus defined, or rather described, by Sir Edward Coke: 'when a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, either express or implied'." 4 Blackstone, Commentaries § 195. For the historical development of this crime, see generally Perkins, A Re-Examination of Malice Aforethought, 43 Yale L.J. 537, 539–44 (1934); Note, Felony Murder as a First Degree Offense: An Anachronism Retained, 66 Yale L.J. 427, 428–31 (1957).

23. See, e.g., 18 U.S.C. § 1111; and generally Wechsler & Michael, A Rationale of the Law of Homicide I, 37 Colum.L.Rev. 701, 705 n. 16 (1937).

24. For discussion of the history of the degree device, see Keedy, History of the Pennsylvania Statute Creating Degrees of Murder, 97 U.Pa.L.Rev. 759 (1949); Wechsler & Michael, supra, note 23 at 703–07. For recommendation that it be abandoned now that capital punishment is no longer mandatory for any type of murder, see Model Penal Code § 201.6, comment at 70 (Tent.Draft No. 9, 1959).

25. Where on the facts of the case the defendant as a matter of law must be guilty of first degree murder if he killed, he may insist that the verdict be guilty of first degree murder or not guilty. Green v. United States, 95 U.S.App.D.C. 45, 218 F.2d 856 (1955), but this rule finds its justification in a fear of a compromise verdict of guilty of second degree murder, even though the jury was not unanimously convinced beyond a reasonable doubt that defendant committed the homicide. Where only second degree murder is charged, defendant cannot be heard to insist on a trial for a higher offense if any. Compare United States v. Fleming, 215 A.2d 839 (D.C.Ct.App.1966) (fact that offense completed no defense to prosecution for attempt).

was envisioned by *Naples II.*[26] Again we emphasize the obvious, that the fact that defendant may be found guilty of both crimes does not mean that he is subject to cumulative punishment.

## II.

5. There is however another strand of legal theory which must be taken into account, the doctrine of lesser included offenses. When a greater and lesser offense are charged to the jury, the proper course is to tell the jury to consider first the greater offense, and to move on to consideration of the lesser offense only if they have some reasonable doubt as to guilt of the greater offense.[27] A jury that finds guilt as to the greater offense does not enter a verdict concerning guilt of the lesser offense. The reason for this absence of

26. Appellant's memorandum on reargument leans heavily on Green v. United States, 355 U.S. 184, 194 n. 14, 78 S.Ct. 221, 226, 2 L.Ed.2d 199 (1957), where the Court wrote: "It is immaterial whether second degree murder is a lesser offense included in a charge of felony murder or not. The vital thing is that it is a distinct and different offense." In *Green*, however, the issue did not involve the permissibility of multiple convictions or consecutive sentences. The question was whether retrial for first degree murder after a successful appeal of a jury verdict of guilty of second degree rather than first degree murder violates the double jeopardy clause. The notion of "separate and distinct" offenses, determined by their evidentiary requirements, has been the guiding principle for determining the scope of double jeopardy protection. It stems from The King v. Vandercomb & Abbott, 2 Leach 707, 168 Eng.Rep. 455 (1796), where the "same evidence" test determined whether a plea of *autrefois acquit* would lie. *See generally* Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1 (1960); Kircheimer, The Act, the Offense, and Double Jeopardy, 58 Yale L.J. 513 (1949); Comment, Twice in Jeopardy, 75 Yale L.J. 262 (1965); Comment, Statutory Implementation of Double Jeopardy Clauses: New Life for a Moribund Constitutional Guarantee, 65 Yale L.J. 339 (1956). We need not consider whether the evidentiary rule, which has been reevaluated to the extent that it permits consecutive punishments, may, also be in process of reevaluation to the extent that it limits the plea of double jeopardy, see Abbate v. United States, 359 U.S. 187, 196, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (separate opinion of Brennan, J.); United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); *compare* Robison v. United States, 390 U.S. 198, 88 S.Ct. 903, 19 L.Ed.2d 1040 (1968).

Where the identity of offenses for purposes of double jeopardy is at issue, first degree murder is distinct from second degree murder because it requires an extra element of proof, namely that the killing was premeditated or that it was perpetrated in the course of an enumerated felony. Therefore, a jury's failure to convict of first degree murder is a refusal to find that extra element. It creates a double jeopardy bar either on a theory of implied acquittal of the greater offense or because the jury has been dismissed, without the defendant's permission, without rendering a verdict as to the greater offense. *See* Downum v. United States, *supra* note 19. On this latter ground, where the two offenses are proved by the same evidence but carry different penalties, *see* Cichos v. State of Indiana, 385 U.S. 76, 87 S.Ct. 271, 17 L.Ed.2d 175 (1966) (writ of certiorari dismissed as improvidently granted).

27. United States v. White, 225 F.Supp. 514 (D.D.C.1963); W. Mathes & E. Devitt, Federal Jury Practice and Instructions, § 15.10 at 159 (1965). It was in light of this principle that the writer of this opinion stated, in Austin v. United States, that: "Since a verdict of murder in the second degree negatives a finding of premeditation and deliberation, the jury could not be permitted in the same verdict to recite that the murder was in cold blood." (127 U.S.App.D.C. 180, 193 n. 27, 382 F.2d 129, at 142 (1967)) Given that the jury has been told to first decide guilt as to first degree murder, its decision to pass on to second degree murder and convict of that reflects a determination that some element of first degree murder is lacking (or else misunderstanding of the charge).

The *Austin* footnote was in error in citing *Naples II*, or in implying that *Naples II* could be defended on that basis, as that case did not involve second degree murder charged as a lesser offense. In acknowledging that error, it may be appropriate to invoke the wisdom of Jackson, J., concurring in McGrath v. Kristensen, 340 U.S. 162, 176, 177, 71 S.Ct. 224, 95 L.Ed. 173 (1950).

consideration is not any inconsistency between the offenses. It rather reflects the very "inclusion" that defines the lesser offense as one "included" in the greater. A lesser included offense is one which is necessarily established by proof of the greater offense,[28] and which is properly submitted to the jury, should the prosecution's proof fail to establish guilt of the greater offense charged, without necessity of multiple indictment.

6. The doctrine of lesser included offenses is not without difficulty in any area of the criminal law. Its application as to criminal homicides is particularly elusive. Second degree murder is clearly a lesser included offense for all purposes of first degree premeditated murder.[29] The confusion arises when considering whether second degree murder is a lesser included offense when the indictment charges first degree felony-murder. That difficulty stems from the fact that the felony-murder doctrine, 22 D.C.Code § 2401, defines as first degree murder a killing committed in the course of certain felonies regardless of whether the actor had any intention to do physical harm, let alone kill.[30] The second degree murder statute, however, requires that a killing be done with "malice aforethought." If given its connotation in common speech the word "malice" would seem to imply that the actor must have an intention to kill, or at least a reckless indifference to whether he does harm. If this were the only legal meaning of "malice" then first degree felony-murder and second degree murder would be distinct offenses, with second degree requiring as a legal element the intentional desire to do harm which is irrelevant (although possibly present in a given case) in felony-murder.

At common law, however, killings in the course of a felony were murders because they were considered killings done with "malice" on a theory of transferred intent. The evil or wicked state of mind that the common law deemed "malice" was supplied by the intent to commit the felony. As Judge Stephen cautioned the jury in his famous charge in Rex v. Serné.[31] "The words malice aforethought are technical. You must not, therefore, construe them or suppose that they can be construed by ordinary rule of language." Malice had a special meaning, and it embraced any killing, accidental or not, perpetrated in the

---

28. This is the customary definition of an included offense, although it is not strictly accurate when crimes are differentiated on the basis of the kind of intention the actor must have. For example, proof of an intentional killing does not, in a sense, establish that the actor was reckless. There is more precise analysis in the Model Penal Code § 1.07(4) which defines an offense as included when:

 (a) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

 (b) it consists of an attempt or solicitation to commit the offense charged or to commit an offense otherwise included therein; or

 (c) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.

29. Thus an appellate court can order entry of convictions as to second degree murder when the evidence is insufficient only as to premeditation. Austin v. United States, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967).

30. Because the felony-murder rule does disregard the actor's intention to do bodily harm, it has had "an extensive history of thoughtful condemnation." 65 Colum. L.Rev. 1496 (1965). See, e.g., First Report of His Majesty's Commissioners on Criminal Law 29 (1834) ("totally incongruous with the general principles of our jurisprudence"); 3 J. Stephen, History of the Criminal Law of England 75 (1883) ("a monstrous doctrine"); Model Penal Code § 201.2, comment 4 at 37 (Tent. Draft No. 9, 1959) (principled argument in its defense is hard to find). See generally, Note, Felony Murder as a First Degree Offense: An Anachronism Retained, supra note 22.

31. 16 Cox C.C. 311 (1887).

course of a felony—at least where the felony is itself dangerous to life.[32]

We need not rule here on the present applicability in the District of this common law doctrine of malice, although some of our cases,[33] including dictum in a recent one [34], imply that the doctrine is still in effect. What is clear from our cases is that the jury may be instructed on second degree murder as a "lesser included offense" even though the indictment is solely for felony-murder.[35]

The point that second degree murder is a lesser included offense of first degree felony-murder is not negatived by the fact that in some cases a charge of second degree murder may not properly be demanded on the facts. That charge is appropriate only₁ when on the facts of the case the jury may consistently find the defendant both innocent of felony-murder and guilty of second degree murder.[36] This is merely application of the general federal rule that lesser included offenses may be charged only when the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense.[37] The jury is not given carte blanche to find the defendant guilty of only the lesser offense when such guilt necessarily establishes guilt of the greater offense. But this rule for delineating the jury's province does not affect the definition of what is a lesser included offense.

Taken by itself an indictment charging murder committed in the course of a felony might be thought inadequate to serve as notice that defendant might have to defend against a charge of murder that was intentional (but not premeditated). But an indictment for murder must be read in the light of the history of the crime. Counsel retained or assigned to defend a man accused of felony-murder are not misled. They are aware that the facts of the homicide are to be brought out, that a verdict of second degree murder is appropriate if there is proof from which the jury might reasonably find that the defendant did not commit one of the enumerated felonies but was guilty of an intentional killing on impulse, and that on this state of proof a charge of second degree murder as a lesser included offense may be requested by prosecution or defense. In short, as Judge Edgerton put it, the felony-murder "indictment and our decisions fully apprised

32. Coke, Institutes Parts III & V 56 (1680) hypothesized that a death caused by a stray arrow shot at a tame fowl would be murder, since hunting tame fowl was illegal. See also Stephen, Digest of the Criminal Law, art. 223 (1887). But in his charge in Rex v. Serné, supra, Stephen thought the felony had to be one itself dangerous to life.

33. Particularly Lee v. United States, 72 App.D.C. 147, 112 F.2d 46 (1940). See also, Marcus v. United States, supra note 20, 66 App.D.C. at 305, 86 F.2d at 861; Sabens v. United States, 40 App.D.C. 440, 442 (1913); Norman v. United States, 20 App.D.C. 494, 499 (1902); Jackson v. United States, 114 U.S.App.D.C. 181, 313 F.2d 572 (1962) (by implication).

34. Hansborough v. United States, 113 U.S. App.D.C. 392, 394, 308 F.2d 645, 647 (1962).

35. See e.g., Jackson v. United States, supra note 33; Kitchen v. United States, 95 U.S.App.D.C. 277, 278, 221 F.2d 832, 833 (1955), cert. denied, 357 U.S. 928, 78 S. Ct. 1378, 2 L.Ed.2d 1374 (1958); Goodall v. United States, 86 U.S.App.D.C. 148, 180 F.2d 397, 17 A.L.R.2d 1070, cert. denied, 339 U.S. 987, 70 S.Ct. 1009, 94 L. Ed. 1389 (1950).

36. See, e. g., Coleman v. United States, supra note 20; Green v. United States, supra 95 U.S.App.D.C. at 48, 218 F.2d at 859; Goodall v. United States, supra 86 U.S.App.D.C. at 151, 180 F.2d at 400.

37. See Sansone v. United States, 380 U.S. 343, 349–350, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); Stevenson v. United States, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); Sparf v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895). See also Model Penal Code § 1.07(5): "The Court shall not be obligated to charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."

the defendant of what he must be prepared to meet" on the issue of second degree murder.[38]

■ 7. The jury may consider the issue of second degree murder on an indictment of first degree felony-murder only if it finds some defect with the proof as to felony-murder.[39]

■ In general the chargeability of lesser included offenses rests on a principle of mutuality, that if proper, a charge may be demanded by either the prosecution or defense.[40] We see no reason why the prosecution should have an option unavailable to defendant, of being able to insist that the jury render a verdict on the lessor offense notwithstanding a verdict of guilty of the greater offense, and should be able to realize on that option by the simple technique of filing an indictment in two counts rather than one.[41] While the prosecutor may properly file in two counts of first degree murder, once the charge of premeditated murder is struck as supported by insufficient evidence, and that count is reduced to second degree murder, the defendant is entitled, on motion, to have the entire count struck, and to have the issue of guilty as to second degree murder submitted only as a lesser included offense, and only in the event of reasonable doubt of guilt of the greater offense.

If the defendant exercises his right to request that second degree murder be presented only as a lesser included offense, then as with *Naples II*, the jury will only render one verdict. That the defendant has a right on request to this sort of ordered presentation is, however, far different from *Naples II*. The jury is not to be told the crimes are alternatives. It is not to be told to acquit of second degree murder if it convicts of first degree. On the contrary, it does not even consider the issue of second degree murder unless it acquits as to first degree.

■ 8. In this case the trial judge charged the jury with respect to both felony-murder and second degree murder. He did not instruct the jury to consider the question of second degree murder only if they determined that the Government had not met its burden as to some element of the first degree murder count. No request, motion or objection was made by appellant. In our view appellant cannot obtain reversal on the ground that there was "plain error affecting substantial rights."[42]

Our reasons for holding that there is no basis for reversal is that, in many instances, it makes sense to permit a verdict of second degree murder to be entered by a jury that also enters a verdict of felony-murder. It makes sense in terms of the strong policies favoring prosecutorial joinder of all possible theories of the crime in one trial in the absence of prejudice[43] and the principle of sound judicial administration that retrials are to be avoided wherever possible.

---

38. Jackson v. United States, *supra*, 114 U.S.App.D.C. at 183, 313 F.2d at 574 (1962).

39. *See* note 27 *supra*.

40. Kelly v. United States, 125 U.S.App. D.C. 205, 370 F.2d 227 (1966), cert. denied, 388 U.S. 913, 87 S.Ct. 2127, 18 L. Ed.2d 1355 (1967). The doctrine of lesser included offenses originated as a rule for the benefit of the prosecution, to permit a (diminished) charge when there was failure in prosecution proof of an element of the crime charged in the indictment. It was extended to permit the accused to request a lesser included offense instruction.

41. Certainly it would be inappropriate to submit a count of second degree murder in a case where that crime could not be charged as a lesser included offense.

42. We thereby overrule *Naples II* insofar as it holds the mere conviction of both offenses necessarily establishes prejudicial error.

43. Fed.R.Crim.P. 8(a) permits joinder wherever the offenses are "based on the same act or transaction." The Model Penal Code § 1.07(2) and § 1.09(1) would require joinder by imposing, with some limitations, a bar to a subsequent prosecution. *Compare* Robison v. United States, 390 U.S. 198, 88 S.Ct. 903, 19 L.

It also makes sense from the defendant's point of view, since the defendant may reasonably desire to get the matter decided once and for all, a desire that may possibly have dimension as a constitutional right to resist the discharge of the jury until it has determined guilt of all offenses possible under the indictment.[44] Specifically, suppose a case like appellant's, of a defendant charged with rape, felony-murder and second degree murder. Suppose further that the defense is that the accused was merely rough-housing, had no intention whatever to sexually molest, and the blow that killed was an accident. The evidence is weak on the issue of rape, and stronger on the issue that the blow was struck with malice. If the only verdict is of felony-murder, a reversal because of insufficiency of evidence of rape confronts defendant with another trial for second degree murder [45] with all the anxiety that entails. Also at the second trial the prosecution, now aware of the defendant's evidence—which had to be introduced in view of the possibility that the jury might come to consider the second degree charge—may avoid troublesome spots that emerged in the first trial.[46]

In view of the foregoing, we think it fair to require that a request for striking the second degree count be made by a defendant who desires submission of that crime solely as a lesser included offense. In the absence of such defense request, the verdict of second degree murder in addition to first degree murder is akin to a special finding,[47] sought by the prosecution and acquiesced in by the defense, as to the state of mind concerning the homicide apart from the intent as to the felony.[48] The requirement of a defense motion also obviates any risk that a trial court's *sua sponte* dismissal might be misunderstood and thereafter lead to contentions of double jeopardy, or questions as to the appropriateness of subsequently charging second degree murder as a lesser offense.

9. Our conclusion that the defendant is required to make the motion that

---

Ed.2d 1040 (1968); Hoag v. State of New Jersey, 356 U.S. 464, 78 S.Ct. 829, 2 L. Ed.2d 913 (1958); Ciucci v. State of Illinois, 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed. 2d 983 (1958); *see also* Abbate v. United States, *supra* note 26.

44. Downum v. United States, *supra* note 26, *but cf.* United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); Cichos v. State of Indiana, *supra* note 26.

45. Ball v. United States, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). If defendant can be retried for the same offense after reversal of conviction, it is clear that he can be retried as to one whose elements are contained therein. A difficult double jeopardy question would arise if a *Naples II* charge were given and the jury acquitted as to second degree murder while convicting of first degree murder, *see* note 19 *supra*.

46. *See* Carsey v. United States, 129 U.S. App.D.C. 205, 392 F.2d 810 (1967).

47. We note, in passing, that while the Federal Rules of Criminal Procedure do not specifically provide for special findings of fact, Rule 57(b) might serve as authorization. *See, e.g.,* Holmes v. United States, 124 U.S.App.D.C. 152, 363 F. 2d 281 (1966). Special jury verdicts in criminal cases have deep common law roots. See for example Judge Palmieri's careful opinion in United States v. Ogull, 149 F.Supp. 272 (S.D.N.Y.1957), aff'd *sub nom.* United States v. Gernie, 252 F. 2d 664 (2d Cir.), cert. denied, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958). The Supreme Court has approved their use at least by strong implication, *e.g.,* Kawakita v. United States, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952). Moreover, as such a finding is possible if the case is tried without jury, F.R.Crim.P. 23(c), a comparable procedure might be required under United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

48. We need not now consider whether and to what extent the kind of special finding of second degree murder verdict under discussion requires modification of the conventional common law instruction that "malice" exists if the defendant had a wicked state of mind. Defendant may contend that such a malice instruction perpetuates the prejudice from an error appearing in connection with definition of the other felony.

second degree murder be presented only as a lesser included offense rests on our view that the lack of such restriction does not tend to confuse the jury, and our inability to find any reasonable basis for concluding that, either in the case at bar or others that come to our mind, the jury has been or may be confused as to its duties in determining what showing is requisite to establish a case of first degree murder.

Appellant's argument, if we understand it correctly, is ultimately cast in terms of jury room mystique: namely, that when all is said and done, one can never tell what would have gone on in the jury room had the charge been given.

We reject defendant's approach. We might reach a different result if we started from the premise that the jury has an unrestricted function in determining whether its verdict should reflect a conclusion of guilt as to the lesser or greater offense. But the law defines the jury's duty otherwise. It must first consider the highest crime charged by the government in its indictment, and consider whether the defendant is guilty on that charge. If it is satisfied beyond a reasonable doubt that defendant is guilty of that greater offense, it is the jury's duty to bring in a verdict that says so. Only if the jury has a reasonable doubt as to guilt of the higher offense, may a jury performing its duty acquit of that charge, and only then may it turn to consideration of whether defendant is guilty of the lesser offense.

 There are occasions when a court accepts a jury verdict that cannot be defended in terms of rationality and consistency, occasions that reflect the jury's historic power.[49] But this does not mean that a defendant has been legally prejudiced merely because the terms of reference to the jury do not cater to the possibility that it may act irrationally or in blatant disregard of the law.

 Multiple convictions cannot be said to constitute cause for reversal unless either the crimes are truly inconsistent or the circumstances are such as to make it reasonable to conclude that the jury was unable to keep the various matters separate or may have been confused as to what constituted the particular offenses. Without such a showing there is no reasonable possibility that the defendant was prejudiced. Prejudice is not shown by invoking the speculative possibility that a jury would have reached a different verdict by acting irrationally, or by invoking a vague and irrational possibility that somehow the whole thing might have gone differently had only the words been changed a bit.

The fact that the jury "might have done it differently" was rejected as a basis for finding prejudicial error in the *Hirabayashi* line of cases.[50] This principle is fully applicable in the area of lesser included offenses where the doctrines have been shaped from the start so as to exclude claims based on the hope of irrational or inconsistent verdicts.[51]

In appellant's case it is not reasonable to infer that the failure to follow a lesser included offense approach may have confused the jury on the issue of guilt of felony-murder. We cannot say that the jury's concurrent consideration of both felony-murder and second degree mur-

**49.** United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943); Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932) (Holmes, J.); Jackson v. United States, *supra* note 33; *compare* United States v. Maybury, 274 F.2d 899 (2d Cir. 1960); *see generally,* Bickel, Judge and Jury—Inconsistent Verdicts in the Federal Courts, 63 Harv.L.Rev. 649 (1950).

**50.** Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943),

holding that a conviction may stand even though there is error as to some other count on which sentence has been concurrently imposed. Yet one can never really tell what the jury would have done in fact had it not been for the presence of an error, however analytically separate its legal setting.

**51.** *See* cases cited *supra* note 37.

der reflects a plain violation of substantial rights.[52]

Unless and until the question is reconsidered by Congress, perhaps in the light of recommendations of the new Commission on Revision of the Criminal Laws of the District of Columbia, the trial judge has no discretion to give less than the life sentence for felony-murder.[53] That judgment is accordingly

Affirmed.

FAHY, Senior Circuit Judge, with whom Chief Judge BAZELON and Circuit Judge J. SKELLY WRIGHT join, dissenting:

Due to the admission in evidence of the confessions I would reverse the convictions for the reasons set forth in my opinion of November 20, 1967, dissenting from the affirmance then by a division of the court of the conviction of rape. With regard to the convictions of first degree felony murder and manslaughter, affirmed now by the court en banc, I would reverse on the additional ground that it was prejudicial error for the trial court to send the case to the jury in such a way as to permit convictions of two degrees of homicide for the same death, contrary to the decision of this court in Naples v. United States, 120 U.S.App.D.C. 123, 131–132, 344 F.2d 508, 516–517, referred to as Naples II.

In *Naples II* the court said:

We think the court erred in refusing to instruct the jury that it could not find appellant guilty of both first degree and second degree murder. Since the jury found appellant guilty on both counts, the error must be deemed prejudicial.

---

52. There is one action, of a technical nature, to which defendant is entitled on this appeal, even though he did not raise the point in the District Court. He is entitled to ask that the judgment on the lesser sentence be vacated—which is of course not the same as a verdict of acquittal. This course is followed by some state courts, see e.g., Wildman v. State, *supra* note 17; People v. Quinn, 61 Cal. 2d 551, 39 Cal.Rptr. 393, 393 P.2d 705 (1964); State v. Quintana, *supra* note 17. Others hold that the lesser conviction should be vacated (without, however, affecting the conviction or judgment of the greater offense). State v. Riley, *supra* note 17. The New York courts, however, regard the concurrent sentence as not being punishment at all, People ex rel. Maurer v. Jackson, *supra* note 17; People v. Cheeks, 16 A.D.2d 742, 227 N.Y.S.2d 105 (4th Dept. 1962), aff'd, 13 N.Y.2d 703, 241 N.Y.S.2d 177, 191 N.E.2d 677.

While error on a count as to which a concurrent sentence has been imposed is not grounds for reversal, Hirabayashi v. United States, *supra* note 50, there are federal cases directing that the concurrent sentence should be vacated where imposed on multiple convictions of the same or included offenses, on a theory that parole or pardon may conceivably be affected thereby. See, e.g., Audett v. United States, 265 F.2d 837 (9th Cir. 1959); Dailey v. United States, 259 F.2d 433 (7th Cir. 1958), cert. denied, 359 U. S. 937, 79 S.Ct. 653, 3 L.Ed.2d 638 (1959); United States v. Machibroda, 338 F.2d 947 (6th Cir. 1964) (dictum). Although we think it very unlikely that parole or pardon for murder will be adversely affected by a concurrent sentence for manslaughter, we see no particular reason why that concurrent sentence should be left standing and we direct that it be vacated.

53. Under the present statute neither the sentencing court nor the jury can provide a less severe punishment tailored to the individuated circumstances of the crime, even where the death is accidental. In appellant's case the judge held there was no evidence of premeditated murder and on Count II the jury did not convict of second degree murder but only of manslaughter. The judge could not consider the possibility that appellee's offense reflected not an established rapist criminality but a transient passion; that his lady friend's rejection earlier in the evening may have produced what was an aberration rather than a characteristic response. The problem is different from that presented where the felony preceding the death is likely to be premeditated; the warning that even accidental homicides will be first degree murder may deter some robbers and housebreakers from the use of guns.

The *Model Penal Code* recommends that the fact that a homicide occurred in the course of one of a list of felonies be taken into account as an aggravating factor in sentencing, but be subject to offset by mitigating circumstances.

Sections 22–2401–02, District of Columbia Code (1961), define first degree murder.[16] Section 22–2403 provides: "Whoever with malice aforethought, *except as provided in sections 22–2401, 22–2402*, kills another, is guilty of murder in the second degree."[17] (Emphasis supplied.) This makes it clear that a single offense cannot be both first and second degree murder. In Goodall v. United States, we said an instruction on both first and second degree murder.

"is necessary only when from the evidence as a whole the jury might reasonably find the defendant guilty of *either* first or second degree murder, and *therefore must decide which degree had been committed.*" [686 U.S.App.D.C. 148, 151, 180 F.2d 397, 400, 17 A.L.R.2d 1070 (1950), cert. denied, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389 (1950), emphasis supplied.]

"At common law there were no degrees of murder. All homicide with malice aforethought, whether express or implied, was murder. And all murder was punished by death." Clark & Marshall, CRIMES § 10.09 at 608 (6th ed.1958). By statute murder was defined in various degrees in order to treat criminal behavior on a more individual basis. "First degree murder" now stands as the criminal act deserving the most severe sanction. To permit conviction of both first and second degree murder for the same offense would be contrary to the intent of the nineteenth century legal reforms which displaced undifferentiated common law murder. [Footnotes omitted.]

It will be seen from this language that the court did not rule that in rendering a verdict of guilty the jury was required also to render formal verdicts of not guilty of other degrees included in the indictment. It is true, as the majority now points out, the *Naples II* court was silent in face of the contrary interpretation of its opinion by the dissenting judge; but this is not conclusive. There is no need to go beyond the central position that it was error to permit a guilty verdict of both first and second degree murder. To go beyond this would give rise to the troublesome double jeopardy contentions referred to in the court's present opinion. Whether those problems would carry the day against *Naples II* as construed by its dissenting judge we need not ponder; for the problems can be avoided by requiring a case such as Fuller's to be submitted to the jury under instructions which treat second degree as a lesser included offense of first degree murder. I understand from Part II of the opinion that this course is approved; but the court does not reverse for failure to follow it since counsel for Fuller did not request the instruction. The court affirms the two convictions on the theory that the omission of such an instruction is not plain error affecting a substantial right to be noted under Rule 52(b), Fed.R.Crim.P., a matter I cover when I reach the question of prejudice.

Laying aside for the moment the question of prejudice, I consider first in more detail whether there was error, though as will appear, error and prejudice sometimes become commingled.

The *Naples II* opinion discusses the error on the basis of the structure of our Code, considered on the background of the common law. The opinion also relies upon Goodall v. United States, 86 U.S.App.D.C. 148, 151, 180 F.2d 397, 400. More recent support of *Naples II* could be found in Austin v. United States, 127 U.S.App.D.C. 180, 382 F.2d 129, footnote 27, except that Judge Leventhal, the author of the *Austin* opinion, now considers such support to have been a mistake. In any event *Naples II* must rest upon its own merits.

Although the court holds that if request had been made the trial judge should have instructed the jury that it could find Fuller guilty of only one homicide the court upholds the two convictions on the theory that the crimes of first degree felony murder and second degree or manslaughter are not incon-

sistent. I disagree. I think the error lies not only in not following the course dictated by the lesser included offense doctrine but also because the crimes of first degree felony murder and second degree murder or manslaughter are inconsistent. In Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, it is pointed out that felony murder and second degree murder are "distinct and different" crimes. While distinct and different crimes may be the subject of a single trial a person cannot be convicted of two such crimes for the same offense.

As the court properly points out the elements of one crime may be so inconsistent with those of another, as larceny and receiving stolen goods, as to preclude convictions of both crimes upon the same evidence. In another situation two crimes will share certain elements but each will have elements not shared by the other, such as an assault with a deadly weapon and an assault with intent to kill. They share the element of assault but one requires in addition the use of a deadly weapon and the other the intent to kill. In Ingram v. United States, 122 U.S.App.D.C. 334, 353 F.2d 872, we did not disapprove convictions of two such crimes at one trial, but required non-consecutive sentences. In another situation the elements of one crime may include all those of another but also additional elements. Rape, for example, includes all elements of an assault, but it also includes additional elements of its own.

Felony murder has been held to include all of the elements of second degree murder and of manslaughter. See, e. g., Jackson v. United States, 114 U.S.App. D.C. 181, 183, 313 F.2d 572, 574. However, the relationship between degrees of homicide differs from the relationship, for example, between assault and rape. Whether a crime is premeditated murder or manslaughter the end result is the same—a death. In the case of rape, however, the result is quite dif-ferent from an assault. Where both assault and rape occur it would not be factually inconsistent for the jury to return a separate conviction for each, though for some other reason the law might not permit this. Where, however, there is only one result—for example, a death—there is inconsistency in attributing two distinct crimes to the several physical actions and states of mind culminating in a single homicidal result.[1]

It seems to me a jury is erroneously deprived of its historic function of determining the degree of seriousness of a homicide when it is permitted to decide that it is one degree of gravity, manslaughter, and at the same time that it is another degree of gravity, first degree. An unlawful killing is not divisible into two such verdicts. For the jury the degrees in the end are mutually exclusive. Otherwise there is not only inconsistency but also uncertainty as to which crime the defendant committed.

*Naples II* does not require the charge to the jury to be in alternative terms, as the court imputes to that decision. The heart of the decision is in not permitting the two verdicts to be returned, whether or not the case goes to the jury in alternative terms or under the lesser included offense doctrine, though in all substance both methods of submission do post alternatives for the jury.

The court concludes that injustice is avoided in the two verdicts by requiring noncumulative sentences. This bypasses the issue. The injustice—the prejudicial character of the error— occurs before the sentencing is reached. It attaches to the manner in which the verdicts themselves are reached. Noncumulative sentences are never a cure for error. They are required not to avoid error in verdicts but to carry out the intention of Congress, considered with a policy of leniency, to prevent two penalties for two crimes which, although different, factually are closely related.

1. I lay aside as not presently presented any question involved in verdicts for first degree felony and at the same time first degree murder of deliberate and premeditated malice.

See Ingram v. United States, *supra.* Impermissibility of multiple sentences for separate but related crimes does not render permissible multiple convictions for the same crime.

Nor has the *Hirabayashi* line of cases application to our situation which involves the vulnerability of both verdicts of guilty. Those cases hold that it is unnecessary where the sentences are concurrent to review for possible error convictions on each count of a multiple count indictment when the conviction on one count is found to be free of error, thus supporting the judgment. Here the question is whether either conviction is free of error; for both are in question, including of course the one carrying the greater sentence.

Part II of the court's opinion accepts the position that had counsel asked for an instruction under the lesser included offense doctrine the two verdicts of guilty would not have been permitted. The court would distinguish that situation from *Naples II* by stating that such an instruction does not put the matter to the jury in alternatives, since when the jury finds the greater offense it does not consider the lesser. Yet it is because the court considers the lesser as included in the greater that in Part I it approves verdicts of both the lesser and the greater. Paradoxically, in Part I the court concludes that the two homicide verdicts against Fuller are consistent on the ground that the elements of one are included within the elements of the other, yet in Part II the court agrees that upon appropriate request the trial judge should have instructed the jury to return only one homicide verdict on the very ground that one of the crimes was included within the other. Since Fuller's case could have been submitted in this manner it should have been, avoiding the error in permitting the two guilty verdicts for the same homicide.

*Naples II* does not depend upon consideration of the possible verdicts in the alternative; but if it did it would not thereby bar the lesser included offense instruction for under such instruction the verdicts are also considered in the alternative on the entire evidence. Should the greater offense be agreed upon no verdict is rendered for a lesser; and if the lesser is agreed upon no verdict as to a greater is returned. The rendition of only one verdict does not mean that the jury in its deliberations does not consider simultaneously both degrees.

The court denies to Fuller the benefit of the lesser included offense procedure, under which he could have been convicted of but one degree of homicide, because his counsel omitted to alert the court to its availability. The court seeks to justify this by suggesting several advantages in permitting two guilty verdicts for the same homicide. None of these was sought by Fuller, and none overrides the prejudice to him which has occurred, more fully discussed in a moment. Indeed the court now recognizes that submitting two guilty verdicts as permissible might be prejudicial if the jury had an "unrestricted function in determining whether its verdict should reflect a conclusion of guilt as to the lesser or greater offense." Yet this is truly the function the jury does have. For though it is true as the court states that the jury in the proper performance of its duty may not return a verdict on the lesser offense unless it has failed to agree on the greater, in its deliberations the jury considers all the evidence bearing on the greater and the lesser offenses and decides which has been proved to its satisfaction. It then renders a single verdict accordingly. In so deliberating the jury acts rationally in the performance of its duty under the law, not irrationally or inconsistently with its duty as the court suggests.

Considering now more fully the issue of prejudice, this is an elusive concept. To decide the issue of prejudice requires a court to reach a conclusion about the effect of error upon the decisional processes of a jury. The governing standard is not whether prejudice was "actual" or even "probable." Where there is error, especially in a capital

case, the question is "whether there is *reasonable possibility* that [the defendant was prejudiced." United States ex rel. Hetenyi v. Wilkins, 348 F.2d 844, 864 (2d Cir.), cert. denied, Mancusi v. Hetenyi, 383 U.S. 913, 86 S.Ct. 896, 15 L.Ed.2d 667 (Emphasis in original.) The Supreme Court has adopted the "reasonable possibility" formulation to determine prejudice to an accused in other contexts. *See, e. g.,* Fahy v. State of Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171; Stoner v. State of California, 376 U.S. 483, 490, n. 8, 84 S.Ct. 889, 11 L.Ed.2d 856. But the problem need not be confined to an idea so expressed. Here we simply do not know what the verdict would have been had *Naples II* been followed. We do know that the jury, if properly instructed, might have found the defendant (1) guilty only of second degree murder, (2) guilty only of manslaughter as a lesser included offense, or (3) not guilty of either of the two murder counts. Each of these was submitted to the jury, but the jury was not confined to rendering a guilty verdict as to but one. It is significant that under the second count the jury returned a verdict of manslaughter rather than second degree murder. If, as is not unlikely, the jury then concluded that having also found the defendant guilty of rape it was required to find him guilty of first degree felony murder, the prejudice is clear. If confined to one guilty homicide verdict they might have found the rape independent of the homicide, and limited the homicide to manslaughter or second degree. Or the homicide might have been thought to have been unintentional, for which reason the jury might have rendered a second degree verdict, as the trial judge authorized. The jury might have been unwilling on the evidence of the confessions alone to reconstruct the crime beyond a reasonable doubt as requiring a verdict of first degree felony murder,

For me to say the result would have been the same as it was, that is, first degree, with manslaughter added as superfluous as it were, would be for me to impose a verdict of my own. To do this would be for me as an appellate judge to substitute my speculation for what should be the jury's determination. I could as well impose verdicts of manslaughter and rape, with no first degree. Though such a result would be unlikely at the hands of a jury on the evidence against Fuller, I cannot say it would not be reasonably possible.

The prejudice becomes even clearer when it is remembered that the trial court quite properly instructed the jury that a verdict of second degree was permissible without the necessity of finding any other guilty verdict of homicide.

The court recognizes the incongruity of Fuller having two sentences for the same homicide. Though counsel made no point of it, this relatively insignificant matter is deemed to require correction while the failure to request the lesser included offense instruction, which might have resulted in no verdict of first degree, is not. The court vacates the less serious sentence. If either sentence is to be vacated it should be the more serious one.

The imposition of the two sentences evidences the error in the two verdicts, but the prejudice lies elsewhere, it is in the two verdicts where only one should have been rendered, leaving uncertainty as to which would have been rendered if the jury had been confined to one. To paraphrase Dozier v. United States, 127 U.S.App.D.C. 266, 382 F.2d 482, 483, although the jury under erroneous instructions decided that all elements of first degree were proved, it does not follow that under proper instructions they would have done so rather than resting their verdict upon manslaughter and, separately, rape.

I respectfully dissent.